MILLE LACS BAND OF CHIPPEWA INDIANS, Arthur Gahbow, Walter Sutton, Carleen Benjamin, and Joseph Dunkley, Plaintiffs,

and

United States of America, Plaintiff–Intervenor,

v.

STATE OF MINNESOTA, Minnesota Department of Natural Resources, and Rod Sando, Commissioner of Natural Resources, Defendants,

and

John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson, and Gary M. Kiedrowski, and the Counties of Aitkin, Benton, Crow Wing, Isanti, Kanabec, Mille Lacs, Morrison, Pine, and Sherburne, Defendant–Intervenors.

Civ. No. 4–90–605.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 24, 1994.

James M. Genia, Mille Lacs Band of Ojibwe, Onamia, MN, Marc D. Slonim, John B. Arum, Ziontz Chestnut Varnell Berley & Slonim, Seattle, WA, for plaintiffs Mille Lacs Band of Chippewa Indians, Arthur Gahbow, Walter Sutton, Carleen Benjamin, Joseph Dunkley.

James M. Johnson, Johnson Law Office, Olympia, WA, Jennifer Ann Fahey, Joint Powers Bd., Mora, MN, for intervenors County of Aitkin, County of Benton, County of Chisago, Sherburne County, Substituted for Chisago County, County of Crow Wing, County of Isanti, County of Kanabec, County of Mille Lacs, County of Morrison, County of Pine.

William Arthur Szotkowski, Stephen Bruce Masten, Jerilyn K. Aune, Sp. Asst. Atty. Gen., Michelle E. Beeman, MN Atty. Gen., St. Paul, MN, for defendants State of Minnesota, Minnesota Dept. of Natural Resources, Joseph Alexander, Com'r of Natural Resources.

Lawrence A.G. Moloney, Gregg J. Tucek, Doherty Rumble & Butler, Minneapolis, MN, for intervenor-defendant Save Lake Mille Lacs Ass'n.

Gary E. Persian, Persian MacGregor & Thompson, Minneapolis, MN, for intervenors-defendants John W. Thompson, Jenny

Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson.

Stephen G. Froehle, Persian MacGregor & Thompson, Minneapolis, MN, for intervenor-defendant Gary M. Kiedrowski.

George Cardinal, Me–Da–We Grand Medicine Soc., pro se.

Zenas Baer, Wefald & Baer, Hawley, MN, for intervenors Dale Hanks, Chief Hole in the Day VII, individually, and on behalf of Mississippi Band of Chippewa Indians.

Robert Michael Small, U.S. Atty. Office, Minneapolis, MN, William A. White, Sheila A. Hackett, U.S. Dept. of Justice, Indian Resources Section, Washington, DC, for intervenor-plaintiff U.S.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

### DIANA E. MURPHY, Chief Judge.

This case is about hunting, fishing, and gathering rights in a large territory that the Chippewa Indians ceded to the United States in a 1837 treaty. The area includes the beautiful Minnesota land surrounding Lake Mille Lacs. Although game and fish are not as plentiful there as they once were, the area is highly valued by Indians and other Minnesota people. Many have a love of the woods and lakes of the region, of hunting and fishing, and of harvesting and protecting the natural resources in the area.

There is widespread interest in this case within the district, and there are fears about the possible impact of any court decision. The court is respectful of all those before it and of the varying interests in the outcome, but it must be guided in its task of decision by the legal precedents and a fair evaluation of the evidence developed in the record and at trial.

The complaint was filed on August 13, 1990 by plaintiffs the Mille Lacs Band of Chippewa Indians, a federally recognized Indian tribe, and four enrolled members of the tribe, Arthur Gahbow, Walter Sutton, Carleen Benjamin, and Joseph Dunkley, (collectively the Band) against defendants the State of Minnesota, the Minnesota Department of Natural Resources, and Rod Sando in his official capacity as Commissioner of Natural Resources (collectively the State). Members of the Mille Lacs Band continue to live near Lake Mille Lacs on reservation lands first settled by the Chippewa in 1750 after they defeated the Sioux who had lived there previously.

Plaintiffs claim that the State has adopted and enforced natural resource laws and regulations that violate the privilege of hunting, fishing, and gathering guaranteed them by the 1837 treaty. They seek a declaratory judgment that "the privilege of hunting, fishing, and gathering the wild rice upon the lands, the rivers and the lakes included in the territory ceded ... during the pleasure of the President" continues to exist. Article V, 1837 treaty, 7 Stat. 536 (1837 treaty).[1] They also seek a declaration stating the permissible scope of state regulation of those activities and an injunction prohibiting enforcement of state fish and game laws against members of the Band unless the regulation is within the scope of the declaratory judgment. They do not seek access to private lands[2] or money damages.

Jurisdiction is invoked under several statutes: 28 U.S.C. § 1331 (action arises under the Constitution, laws, and treaties of the United States); 28 U.S.C. § 1343(a)(3) and (4) (42 U.S.C. § 1983 action for interference with the exercise of rights under the 1837 treaty, due process rights, and the Supremacy Clause); and 18 U.S.C. § 1362 (action brought by an Indian band with a governing body duly recognized by the Secretary of the Interior arising under the Constitution, laws, and treaties of the United States).

The defendants believe that the temporary privilege granted to the Chippewa in 1837

1. This privilege will be referred to in this opinion as the usufructuary privilege or the 1837 privilege.

2. Plaintiffs concede that the 1837 treaty did not provide any special right of access and that the rights they seek to have recognized "may be exercised only on those lands and waters, public or private, to which Band members have access under generally applicable law." Joint Proposed Findings of Fact and Conclusions of Law at 92–93.

was extinguished by President Zachary Taylor in a 1850 executive order. Even if the privilege still existed after the 1850 executive order, however, any remaining interest was ceded in a 1855 treaty between the Chippewa and the United States when the Chippewa relinquished their right, title or interest in and to any other lands in the territory of Minnesota or elsewhere.

The plaintiffs believe that the hunting, fishing, and gathering privilege guaranteed by the 1837 treaty could only be extinguished if the Chippewa made trouble or misbehaved. They believe that this interpretation of the 1837 treaty and their continuous good behavior is supported by the historical record and the case law. They do not believe that any subsequent action by the United States has affected the privilege.

Intervenors have joined the litigation on both sides. Nine counties[3] (the Counties) and six landowners[4] (the Landowners) are defendant-intervenors. The other party to the 1837 treaty, the United States of America, is a plaintiff-intervenor.

The procedure for addressing the issues in the case was discussed at an early stage. In March of 1991 the parties agreed that the case should be bifurcated into two phases, and the court adopted their stipulation in an order issued on April 9, 1991. The order specified that the issues for Phase I include whether the 1837 privilege continues to exist, whether it extends to lands now, or previously, in private ownership, and the general nature of any rights guaranteed by the privilege. Phase II was to follow if it were determined that the privilege continues. Resource allocation issues and the validity of particular measures affecting the exercise of the privilege would be decided in Phase II. The management of natural resources and the regulation of their taking are not part of the legal questions presented in Phase I.

After a ruling on several motions for summary judgment was issued on May 13, 1994, a three week trial was held on the remaining Phase I issues starting on June 13 and concluding on July 6, 1994. Fourteen witnesses testified at trial, and more than 400 exhibits were received. The largest part of the evidence was presented by eleven expert witnesses who submitted most, but not all, of their direct testimony in advance in the form of written reports. Their testimony was then extensively explored and tested on cross examination.

The plaintiffs called six expert witnesses. Dr. Charles C. Cleland, an anthropologist and ethnohistorian, testified about the Chippewa[5] economy; the Chippewa use of natural resources; the Indian treaties of 1837, 1842, 1854, 1855, and 1864; the effort to remove the Chippewa in the 1850's; and off-reservation hunting, fishing, and gathering after the 1855 treaty. Dr. Thomas A. Lund, a legal historian who specializes in American wildlife law, testified about common law rights in game and fish and what the drafters of the 1837 and 1855 treaties likely intended by the language used in key phrases. Dr. James M. McClurken, an anthropologist and ethnohistorian specializing in the history and culture of the Chippewa, testified about the ethnohistory of the Mille Lacs Band and its reservation during the late nineteenth and early twentieth centuries, including treaties negotiated during this time. Dr. John D. Nichols, a linguist specializing in the Chippe-

3. They are the Counties of Aitkin, Benton, Crow Wing, Isanti, Kanabec, Mille Lacs, Morrison, Pine, and Sherburne, all located partially or entirely within the Minnesota territory ceded by the 1837 treaty. They assert that if Band members are allowed to exercise the privilege on county owned lands, the value of that property will decrease. They also contend that their ability to manage tax-forfeited land profitably and derive revenue from it will be adversely affected.

4. They are John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson, and Gary M. Kiedrowski. All have interests in real estate in the ceded territory,

including homes, a resort on Lake Mille Lacs, and woodlands used primarily for hunting. They assert that their interests would be affected if the Band could exercise its privilege on their land and that their property values will decrease because of depletion of natural resources even if the Band only exercises the privilege on public lands.

5. The words Chippewa and Ojibwa or Ojibwe are used by experts and others to refer to the same group of Native American people. Since the words Chippewa and Indians are those which have been used legally, they are adopted in this opinion.

wa language, testified about how key phases in the 1837 and 1855 treaties were likely translated into Chippewa. Dr. Helen H. Tanner, a historian who specializes in the ethnohistory of the Indians of the Great Lakes region, testified about the 1855 treaty negotiations. Dr. Bruce M. White, a historian and anthropologist who specializes in the history of relations between Indians and non-Indians in the Old Northwest, testified about the 1850 executive order and its subsequent suspension.

The State called three expert witnesses. Mr. Alan S. Newell, a historian, testified about the 1837 and 1855 treaties and the 1850 executive order. Dr. John C. Massman, a historian specializing in Minnesota history, testified about the settlement and development of Minnesota from 1819 through 1860. Dr. Paul Driben, an anthropologist, testified about the Chippewa culture and historical developments at the time of the 1855 treaty.

The Landowners called two witnesses. Dr. Donavan L. Hofsommer, a historian with particular expertise in the role of the railroad in western expansion, testified about the expansion of settlers to new territories during the nineteenth century and the manifest destiny idea. Dr. Rod Squires, a geography expert who has studied the history of land ownership, testified about the transfer of land title from the United States to settlers, private companies, and the State during the nineteenth century.

Three members of the Mille Lacs Band testified about the special importance of hunting, fishing, and gathering to their way of life. They told about the traditions learned from their parents and grandparents who taught them to hunt, fish, and gather. They also discussed the relationship of these activities to their traditional ceremonies and religion. One of the witnesses, Herman Kegg, testified that he had served sixty days in jail for violating a state fishing regulation. Another witness, Joseph Dunkley, who is also a named plaintiff, testified that he had received a citation for fishing with two lines. Brenda Boyd testified that her father sold furs to pay her mother's hospital bills, and all three talked about the importance of these activities in supplementing their livelihood.

After trial the parties submitted briefs and supplemented proposed findings and conclusions. Now, after having carefully considered the evidence at trial and the legal arguments presented, and based upon its observation of the witnesses and their credibility, the court submits in memorandum form its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

■ The issues to be decided in Phase I are whether the privilege to hunt, fish, and gather wild rice on the 1837 ceded territory continues to exist; whether the privilege extends to private lands; and the general nature of such rights. Interpretation of the 1837 and 1855 treaties and the 1850 executive order is necessary to resolve these issues. The history of a treaty, the negotiations, and the practical construction of it by the parties to it may all be considered when interpreting an Indian treaty. *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 351 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). The evidence at trial provided relevant historical background, and the Chippewa culture and their early interactions with Europeans are a part of it.

The Chippewa survived by hunting, fishing, and gathering, and they also planted crops such as corn and squash. They used essentially all of the plant and animal species in their environment to satisfy their needs. These species provided them with food, clothing, shelter, medicines, building materials, tools, implements, canoes, paints, dyes, and decorative items. All of these materials came from flesh, skin, horn, bone, quills, feathers, shells, stems, fibers, blossoms, seeds, roots, and bark. The Chippewa also used fish and game in spiritual ceremonies. For example, fresh fish are still necessary for funerals and burials.

The area around Lake Mille Lacs was an ideal location for the Chippewa way of life because the lake was filled with fish and there were large maple sugar groves and wild rice lakes nearby. The Chippewa had a broad and detailed understanding of their

environment and developed efficient methods of gathering natural resources. They also developed social and political systems to allocate the resources.

The largest economic and political unit of the Chippewa society was the band, a loose group of intermarried families who cooperated with one another. The average size of a band was 25 families. Each band occupied a specifically defined, but fluid territory.

The bands moved around their territories during the year to gather resources. During the summer the families in the Mille Lacs Band gathered with other Chippewa bands on lake shores, forming villages of several hundred people where they fished and hunted, collected wild plants, and planted gardens of corn, beans, and squash. At the end of the summer, they gathered wild rice.

During the late fall, the Chippewa harvested spawning species of trout and whitefish which were frozen for winter food. After the fall fishing, each family left its summer village for its hunting territories.

The best winter hunting grounds for the Minnesota Chippewa were in the areas between woodlands and prairies where there were many white-tailed deer and elk. Families normally moved quickly to these lands in the late fall and then spent the winter gradually hunting toward the northern summer village sites. At the end of the winter when game became scarce, the Chippewa relied on their stored food, especially wild rice.

In early spring, families would go to their maple groves to make maple sugar. In late spring, small groups of families met at areas where they could harvest spring spawning fish, especially sturgeon and suckers. The families then returned to their summer villages.

A fundamental principle of the Chippewa economic system was gift giving. No monetary value was assigned to goods and resources. Individuals gained prestige in the society by their generosity. The system encouraged the Chippewa to increase gift giving even when resources decreased.

The Chippewa began to encounter Euro-Americans in the seventeenth and eighteenth centuries. The Chippewa supplied them with clothing, housing, canoes, bark, pitch, cordage, skins, goods made from natural resources, and food. The food included deer, moose, whitefish, lake trout, passenger pigeon, turkey, geese, and ducks.

In the late seventeenth century, the Chippewa also began to participate in the fur trade with both French and British traders. The Chippewa traded fur for knives, axes, and strike-a-lites made from iron, manufactured clothing, firearms, iron traps, iron and brass kettles, and many other items.

"The pre-American history of the Great Lakes fur trade, particularly in the western Great Lakes, was characterized by continuing competition between many small companies and traders." White Supplemental Report at 20–21. During the 1820's and 1840's, however, the American Fur Company was the dominant fur company in the Upper Mississippi region. Fur trading continued in the area after the American Fur Company went into bankruptcy in 1842, but it once again consisted of small companies engaged in intense competition. Fur prices declined after the Panic of 1837, but they recovered by the mid–1850's. During the mid–1850's, the quantity of furs handled in St. Paul continued to increase.

The Mille Lacs Chippewa participated in the fur trade throughout this period. The fur trade continued to be an important part of their economy, but it was never again as dominant as it had been during the eighteenth century.

As the fur trade became less important to the Chippewa in the nineteenth century, the importance of trading wild rice, meat, fish, and other natural resources became more important. During the 1840's and 1850's, the lumbermen and miners working in territory ceded by the Indians created a new market for natural resources.

Commerce between lumbermen and Chippewa was particularly important in the St. Croix valley, the Rum River area, and Lake Mille Lacs area where the large communities of Chippewa and lumbermen traded their abundant supplies of wild rice and fish with the lumbermen. During the mid-nineteenth century the Chippewa also traded their natu-

ral resources and products in St. Paul. The opportunities for trade in natural resources continued to increase for the Mille Lacs Chippewa through the 1850's.

The actions of the newly created United States toward the Indians were governed by the Northwest Ordinance. The Ordinance was enacted by the Continental Congress in 1787 and re-enacted by the first Congress of the United States. 1 Stat. 51. The Ordinance states that its articles "shall be considered as articles of compact between the original States and the people and States in the said territory, and forever remain unalterable, unless by common consent." *Id.* Article III of the ordinance provides in part:

> The utmost good faith shall always be observed toward the Indians; their lands and property shall never be taken from them without their consent; and, in their property, rights, and liberty, they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall, from time to time, be made, for preventing wrongs being done to them and for preserving peace and friendship with them.

*Id.*

The Northwest Ordinance was not repealed, and its requirement of good faith bound the government in its dealings with all Indians, including the Chippewa.

In the 1830's the government pursued a policy of purchasing lands east of the Mississippi River held by the Indians and removing the Indians to areas west of the Mississippi. This policy was reflected in the 1830 Removal Act authorizing the President to convey lands west of the Mississippi to "such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there." 4 Stat. 411 (1830). This statute provided that "nothing in this act contained shall be construed as authorizing or directing the violation of any existing treaty between the United States and any of the Indian tribes." *Id.*

The 1830 act contained provisions to pay for abandoned improvements, to provide Indians with support during their move, and to establish settlements on their new lands. Following this statute, subsequent removal treaties normally contained specific language about how the removal would be accomplished. Cleland Report at 39. Despite the statutory language about such "Indians as may choose to exchange the lands", some people advocated removal regardless of whether Indians consented. President Andrew Jackson vigorously pursued removal and advocated that removal "ought to be persisted in till the object is accomplished, and prosecuted with as much vigor as a just regard to their circumstances will permit, and as fast as their consent can be obtained." *The State of the Union Messages of the Presidents, 1790–1966,* (Fred L. Israel, ed. 1966), at 438, Vol. I.

Treaties that guaranteed tribal rights to hunt, fish, and gather were not uncommon during the era of removal policy. Before 1837 the United States negotiated several treaties that reserved rights for Indian tribes to hunt, fish, and gather on ceded lands.[6]

## II.

In 1837 the United States decided to negotiate a treaty with the Chippewa to ac-

---

**6.** *See e.g.* 1805 treaty with the Wyandot, 7 Stat. 87, art. 4 (Plaintiffs' Ex. 51) ("The said Indian nations, parties to this treaty, shall be at liberty to fish and hunt within the territory and lands which they have ceded to the United States, so long as they shall demean themselves peaceably."); 1818 treaty with the Quapaws, 7 Stat. 176, art. 3 (Plaintiffs' Ex. 52) ("It is agreed, between the United States and the said tribe or nation, that the individuals of the said tribe or nation shall be at liberty to hunt within the territory by them ceded to the United States, without hindrance or molestation, so long as they demean themselves peaceably, and offer no injury or annoyance to any of the citizens of the United States, and until the said United States may think proper to assign the same, or any portion thereof, as hunting grounds to other friendly Indians."); 1820 treaty with the Chippewa, 7 Stat. 206, art. 3 (Plaintiffs' Ex. 152) ("The United States will secure to the Indians a perpetual right of fishing at the falls of St. Mary's, and also a place of encampment upon the tract hereby ceded, convenient to the fishing ground, which place shall not interfere with the defence of any military work which may be erected, nor with any private rights."); 1836 treaty with the Ottawa and Chippewa, 7 Stat. 491, art. 13 (Plaintiffs' Ex. 161) ("The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, until the land is required for settlement.").

quire 13,664,871 acres in present day Wisconsin and Minnesota. Funding and authorization was provided by a 1837 general appropriations act that provided $10,000 "[f]or holding treaties with the various tribes of Indians east of the Mississippi river, for the cession of lands held by them respectively, and for their removal west of the Mississippi." Act of March 3, 1837, 5 Stat. 158 at 161 (Plaintiffs' Ex. 44). It also stated:

> For holding treaties with the various tribes east of the Mississippi river, for the cession of lands held by them respectively, and for their removal west of said river; and with the Sioux for the cession of their country lying east of the same river, and for defraying the expenses of a more particular examination of the vacant lands, west of the Mississippi, with a view to ascertain, whether it be sufficient to accommodate the tribes remaining east of said river, seventeen thousand dollars ...

*Id.* at 162. The United States negotiated 12 treaties with Indian tribes in 1837, four of which contained removal provisions.[7]

In 1837 Wisconsin Territorial Governor Henry Dodge was chosen to negotiate a treaty with the Chippewa pursuant to the 1837 appropriations act. The land that the United States wanted to acquire was a wilderness with only a few hundred non-Indian residents. The Chippewa had limited contact with American citizens except for the lumbermen, missionaries, and fur traders in the area. 1837 Annual Report of the Commissioner of the Office of Indian Affairs 17 [ARCOIA] (Plaintiffs' Ex. 56).

On May 13, 1837, Commissioner of Indian Affairs Carey A. Harris wrote to Dodge to "communicate to [him] the particular objects

of the Government, and its views as to the mode in which they may be accomplished." Harris to Dodge and Smith, May 13, 1837 (Plaintiffs' Ex. 46). Harris stated that "it is understood, that this tract is valuable for its pine woods which cover it, but is unfit for cultivation." *Id.* He continued:

> Its acquisition by the U.S. will be beneficial to both parties. To the United States, by opening to its citizens an extensive wood land, important especially from the rapidity with which settlements are multiplying: to the Indians, by giving them an ample consideration in money, provisions, agricultural and mechanical establishments, education, and other means of improvement.

*Id.* The letter did not contain any reference to the removal of the Chippewa, the 1830 Removal Act, or the 1837 appropriations act. Harris did not forward any treaties to use as a precedent, "[t]here is no treaty, I believe, which will be useful to you as a precedent in forming a conclusion on [the consideration to be paid]." *Id.* Harris also told Dodge and Smith "to ascertain informally in what manner [the Chippewa] would receive a proposition to admit among them the Ottawas and Chippewas of Michigan, who have manifested a reluctance to go west of the Mississippi, agreeably to the provisions of the late treaty." *Id.* at 3.

From July 20 to July 29, 1837, the Chippewa met with Wisconsin Territorial Governor Henry Dodge near Fort Snelling where the Minnesota and Mississippi rivers meet. The Chippewa chiefs and Dodge communicated through interpreters. Verplank Van Antwerp, the treaty secretary and writer of the

---

7. *See* 1837 treaty with the Saganaw Chippewa, 7 Stat. 528, art. 6 (Plaintiffs' Ex. 162) ("The said tribe agrees to remove from the State of Michigan, as soon as a proper location can be obtained."); 1837 treaty with the Potawatomi, 7 Stat. 532, art. 1 (Plaintiffs' Ex. 163) ("And the chiefs and head men above named, for themselves and their bands, do hereby cede to the United States all their interest in said lands, and agree to remove to a country that may be provided for them, by the President of the United states, southwest of the Missouri river, within two years from the ratification of this treaty."); 1837 treaty with the Sacs and Foxes, 7 Stat. 540, (Plaintiffs' Ex. 153) ("The Sacs and Foxes agree to remove

from the tract ceded, with the exception of Keokuck's village, possession of which may be retained for two years, within eight months from the ratification of this treaty."); 1837 treaty with the Winnebago, 7 Stat. 544, art. 3 (Plaintiffs' Ex. 58) ("The said Indians agree to remove within eight months from the ratification of this treaty, to that portion of the neutral ground west of the Mississippi, which was conveyed to them in the second article of the treaty of September 15th, [21st] 1832, and the United States agree that the said Indians may hunt upon the western part of said neutral ground until they shall procure a permanent settlement.").

treaty journal, was of the view that the interpreters were "unfit to act in that capacity." 1837 Treaty Journal at 142 (Plaintiffs' Ex. 49). A missionary who attended the 1837 treaty stated that "there was also a Chippewa interpreter, Stephen Bonga who was also pious, and did the principle interpreting for that tribe; the government interpreter, a thick-mouthed, stammering Irishman not being able to speak intelligibly in either language." Alfred Brunson, *A Western Pioneer or Incidents of the Life and Times of Rev. Alfred Brunson* 83 (1879).

The tremendous challenge facing the translators was made clear by the testimony of Dr. Nichols. Although Dr. Nichols is admittedly not a fluent speaker of Chippewa, he is expert in the language and its structure and vocabulary. He testified as to the radically different structures of the Chippewa and English languages which would have made it extremely difficult to translate complex legal terms under the time pressure for immediate translation. Even the best translators would have had difficulty translating some treaty terms because the Chippewa did not have analogous words for many of the concepts developed in the highly complex and refined English legal vocabulary. Dr. Nichols testified how particular phrases were likely translated. His level of expertise was impressive and not undermined by cross examination.

The Chippewa had developed a simplified and reduced form of their language to use in trading with Euro–Americans. This pidgin Chippewa was adequate for basic communication and trade, but "is not suitable for the translation of such complex language as that used in treaties." Nichols Report at 5.

More than 1,000 Chippewa attended the negotiations, including chiefs of the Mille Lacs, Sandy Lake, Snake River, Fond du Lac, St. Croix River, Gull Lake, Swan River, and Leech Lake bands. Not all of them were present when the negotiations began on July 20, 1837. Those who were insisted that they would not discuss Dodge's proposal until all of the Chippewa who lived on the desired land arrived. A Pillager chief, Aishkebugekoshe (Flat Mouth), explained that although he was a chief, he was "not the chief of the whole nation, but only of my people or tribe." 1837 Treaty Journal at 133.

During the negotiations, Dodge explained that the United States wanted to purchase the land to harvest its pine timber:

Your Great Father The President of the United States has sent me to see you in Council, to propose to you the purchase of a small part of your country East of the Mississippi River. The country, as I am informed, is not valuable to you for its game, and not suited to the culture of corn, and other Agricultural purposes. Your Great Father wishes to purchase your country on the Chippewa and St. Croix Rivers, for the advantage of its pine timber, with which it is said to abound.

1837 Treaty Journal at 131.

Throughout the negotiations, the Chippewa emphasized that they wanted to be able to continue hunting, fishing, and gathering on the lands. Ma-ghe-ga-bo, one of two spokesmen for the Chippewa, stated:

I stand here to represent the Chiefs of the different bands of my nation assembled here, & to tell you of their determination, to sell you the lands that you want of them. My Father, Listen to me. *Of all the country that we grant you we wish to hold on to a tree where we get our living, & to reserve the streams where we drink the waters that give us life.** ... The Chiefs will now show you the tree we want to reserve. This is it (placing an oak sprig upon the Table near the map). It is a different kind of tree from the one you wish to get from us. Every time the leaves fall from it, we will count it as one winter past.

---

* This of course is nonsense—but is given *literally* as rendered by the Interpreters, who are unfit to act in that capacity. I *presume* it to mean that the Indians wish to reserve the privilege of hunting & fishing on the lands and making sugar from the Maple.

1837 Treaty Journal at 142 (emphasis and footnote in original by Van Antwerp).

After Dodge asked for the price of the land, Ma-ghe-ga-bo proposed that they receive a sixty year annuity and "[a]t the end of that time our grand children who will have

grown up, can speak to your for themselves." *Id.* at 143. He also stated, "If I have rightly understood you, we can remain on the lands and hunt there. We have heretofore got our living on them." *Id.* Dodge again asked for the price, but the Chippewa indicated that they would provide an answer the next day after consulting with others. *Id.* at 144. Before the Chippewa departed, Dodge stated:

> that your Great Father, never buys land for a term of years. I will agree on the part of the President, that you shall have the free use of the rivers, and the privilege of hunting upon the lands you are to sell to the United States, during his pleasure.

*Id.* Dodge also stated that it was his wish, "as well as that of your Great Father in Washington, that [the Sub-agents] shall do you justice." *Id.*

On July 28, 1837, Flat Mouth spoke for the Chippewa. He stated:

> My Father. Your children are willing to let you have their lands, but they wish to reserve the privilege of making sugar from the trees, and getting their living from the Lakes and Rivers, as they have done heretofore, and of remaining in this Country. . . . You know we can not live, deprived of our Lakes and Rivers; There is some game on the lands yet; & for that reason also, we wish to remain upon them, to get a living.

*Id.* at 145. Dodge responded:

> My Friends. I have listened with great attention, to your Chief, from Leech Lake. I will make known to your Great Father, your request to be permitted to make sugar, on the lands; and you will be allowed, during his pleasure, to hunt and fish on them. It will probably be many years, before your Great Father will want all these lands for the use of his white Children.

*Id.* at 146. Dodge did not explain the meaning of the phrase "during his pleasure."

During the negotiations of the price Dodge reassured the Chippewa that they would be treated justly by the United States. For example, he stated that "[i]t is my duty in the relation in which I stand to you, to see justice done to you, and so far as it is in my power, I will do it in all things." *Id.* at 150. Dodge also referred to the President as the Great Father. The Chippewa understood that the President would treat them as a good father would treat his children, by offering protection and inviting trust. The Chippewa also believed that treaties were a personal commitment between their chiefs and the President, not just between the Americans and the Chippewa. Cleland Report at 48.

Removal was not discussed during the treaty negotiations. In fact, both the United States and the Chippewa assumed that the Chippewa would continue to live in the ceded territory. During the negotiations Dodge promised that annuities and services would be provided "in their own country."

Dodge and representatives of twelve Chippewa bands, including the Mille Lacs Band, executed the Treaty with the Chippewa of 1837 on July 29, 1837. 7 Stat. 536. The treaty stated in part:

> Article 1. The said Chippewa nation cede to the United States all that tract of country included within the following boundaries: . . . .
>
> Article 2. In consideration of the cession aforesaid, the United States agrees to make the Chippewa nation . . . the following payments. . . .
>
> Article 5. The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guaranteed to the Indians, during the pleasure of the President of the United States. . . .

When the council closed, Dodge stated, "I will recommend you to your Great Father the President, as a good people, who deserve the confidence and friendship of Our Government." 1837 Treaty Journal at 146. The 1837 treaty was ratified by Congress.

Nichols testified persuasively that the combination of the terms "hunting, fishing, and gathering" would have been unusual, and when joined with another unusual grouping of words, "the lands, the rivers, and the lakes", would have been unnatural in Chippewa. These English terms were used to represent the concept of living off the land.

The Chippewa understood that Article 5 allowed them to continue their hunting, fishing, and gathering way of life. The Chippewa also understood that Euro–Americans would begin to enter the ceded territory, but they did not believe that their arrival would interfere with their hunting, fishing, and gathering activities because of the size of the territory, the purpose of the treaty (access to pine timber), and the abundance of resources. Cleland Report at 47.

Moreover, the Chippewa did not understand the phrase "during the pleasure of the President" as a finite limitation on their continued way of life in the ceded territory. A literal interpretation of the phrase "during the pleasure of the President of the United States" would have been "as long as the President was happy" and would not have conveyed a temporal limitation on the activities described earlier in the sentence. Nichols Report at 8. "A restrictive phrase would have contradicted the strength of the probable translation of 'guaranteed' as *baataayaakonigaade* 'it is firmly fixed in place by law, by council.'" *Id.*

As the defendants point out, negotiations between the Chippewa and a missionary who wanted to live among them demonstrate that the Chippewa understood that a privilege could last for a finite amount of time. That particular agreement limited the missionary's residence on their lands to four years. *See* Ayer to Green, Oct. 31, 1838 at 2–4 (State's Ex. 17). This is not evidence, however, that the Chippewa understood the Euro–American meaning of "at the pleasure of the President." The concept of "four years" is much simpler to understand than the Euro–American meaning of the phrase "at the pleasure of the President." Even people fluent in twentieth century English used in the United States might not understand the legal meaning of "at the pleasure of the President."

The conclusion that the literal meaning of the English phrase was not understood by the Chippewa is strengthened by the lack of discussion of the subject. The Chippewa who had persistently demanded to continue their way of life during the treaty negotiations certainly would have objected to Dodge if the literal meaning of the phrase had been conveyed.[8] The understanding of the Chippewa would also have formed by Dodge's assurances that the President would always treat them justly and would protect their rights.

An August 17, 1837 letter from missionary William Boutwell to Reverend Greene is contemporary evidence that the Chippewa did not understand the English meaning of "during the pleasure of the President of the United States":

> You may think me presumptuous, but I am much mistaken if our Govt. are not involved in trouble with the Chipys before 5 years should they attempt to remove them. For Gov. Dodge the Commissioner I entertain the highest respect—but the Inds. have no idea of leaving their country while they live—they know nothing of the duration of a mans pleasure.

Boutwell to Greene, Aug. 17, 1837 at 2 (Plaintiffs' Ex. 54).

---

**8.** The State argues that Dr. Cleland's trial testimony about the phrase "during the pleasure of the President" was not credible because he had written in 1992 that "in northern Wisconsin and western Upper Michigan, the government had been so anxious to acquire timber in the Treaty of St. Peters (1837) that they simply left the Lake Superior Ojibwa wandering the ceded territory. At any time they could be removed by the 'Order of the President' ... It is little wonder that the Indians of the Great Lakes were demoralized and fearful, or that they barraged anyone who would listen with petitions requesting permanent homes." Charles Cleland, *Rites of Conquest* 236 (1992).

Dr. Cleland testified in rebuttal that he had not yet studied the 1837 Treaty Journal when he wrote the book. The State then provided excerpts from his testimony during the allocation phase of the *Lac Courte Oreilles Band v. Voigt* litigation in 1985 to show that he had previously answered questions about the journal. This was a proper subject for impeachment attempts, but the court found Dr. Cleland's explanation believable.

It may be useful at this point, and certainly relevant, to comment on Dr. Cleland's impressive background and forthright demeanor while testifying in this case. He was a knowledgeable and sensitive witness whose evidence appeared reliable and sound, and his credibility was not successfully impeached.

Neither Dodge nor the Chippewa intended or understood that any provision of the 1837 treaty was to provide for removal from the ceded territory. If removal had been intended, then it would have been a topic of discussion during the treaty council, and the treaty would have included provisions for moving the Chippewa similar to those in other treaties with removal clauses. If removal had been a goal of the United States, then the Commissioner of Indian Affairs would have discussed this objective in his instruction letter. He would also have forwarded copies of treaties with removal provisions instead of explaining that no prior treaty would be useful to Dodge. If removal were part of the 1837 treaty, then Dodge would have mentioned it in his report to Commissioner Harris. Dodge to Harris, Aug. 7, 1837 at 5 (Plaintiffs' Ex. 55).

Although some missionaries who lived in the ceded territory feared that the Chippewa might be removed, their correspondence reflects only their understanding of the situation. Just because they feared the Chippewa could be removed, does not mean that the Chippewa understood the 1837 treaty to authorize their removal.

The Chippewa may well have worried about future removal after they signed the 1837 treaty [9], but evidence of such worries is not evidence that the 1837 treaty provided for their removal. Considering the general removal policy of the government at the time, it would have been surprising if Indians had not worried about removal even if they believed that the government did not have any authority to remove them so long as they did not make trouble.

Government correspondence after the treaty was signed indicates that the United States believed that it did not provide for removal and that removal would be very difficult for the Chippewa. In 1839, the Chippewa sub-agent, Daniel Bushnell, wrote to Governor Dodge that the Chippewa should not be removed to lands west of the Mississippi River because they would then be closer to the Sioux and would have to change their way of life. Bushnell to Dodge, Feb. 13, 1839 (Plaintiffs' Ex. 169). In 1840 Bushnell wrote in a report that the resources supporting the Chippewa were gradually declining and that they would have to be moved when the resources failed. 1840 ARCOIA 339 (Plaintiffs' Ex. 172) (Extract of Report of D.P. Bushnell, sub-agent at La Pointe). He suggested that further negotiations would be necessary when removal became necessary:

> The manner of its accomplishment is a subject of great importance to their future well-being. They having insisted on the entire exclusion of their brethren to the east[sic] and north from any of the benefits arising from the country sold, it would be an act of injustice to attempt to throw them back upon those bands. The feeling engendered in the latter by this act, would cause them to resist the attempt, it is believed, as an infringement of their rights. It is also doubted if they could be peaceably removed beyond the Mississippi.

*Id.*

In 1841 James Doty, the new Wisconsin Territorial Governor, wrote to Secretary of War John Spencer that he had:

> sent word to the Chippewa residing in Wiskonsan [sic] that it was probable the President would propose to them to remove to the west side of the Mississippi, above the Falls of St. Anthony, and desired them to take the subject into consideration and let me know whether they would entertain such a proposition and agree to settle down as agriculturists.

---

**9.** Defendants offer three statements to show that the Chippewa worried about removal between 1837 and 1840. The first is a 1840 letter, prepared by Reverend Boutwell, from Chippewa chiefs to the President that states "We sometimes fear that our children, when they come to be sent away from the lands, which we have sold from them, may be foolish and do like some of the other Inds. we hear of." State's Ex. 2. The second is Reverend Ayer's statement that the Chippewa "fear that should the Government ere long drive them away and settle them elsewhere they might not find it easy to subsist upon the chase." Ayer to Greene, October 4, 1837 (Plaintiffs' Ex. 54). The third is the question by Chief Buffalo, "When the whites come among us, where will our children go?" Speech of Buffalo, September 25, 1837 (State's Ex. 2 at n. 33). These statements reflect fear about the future, but they do not indicate that the Chippewa believed that the 1837 treaty provided for their removal.

Doty to Spencer, Nov. 17, 1841 at 2 (Plaintiffs' Ex. 61). Doty also stated that the Chippewa "are willing to treat [sic] with the U.S. for a cession of their country and to remove to the west side of the Mississippi" and recommended "the adoption of measures to obtain the removal of those Indians." *Id.*

Doty's statements indicate that a new treaty with a removal provision would be necessary and are further support that the Chippewa did not agree to removal in the 1837 treaty. His statement that the Chippewa were willing to discuss removal in 1841 was based on a letter from Lyman Warren, a La Pointe trader. Warren to Doty, Oct. 2, 1841 (Plaintiffs' Ex. 62). Warren's statement is not a reliable indicator that the Chippewa were willing to remove, however; he was motivated to encourage a treaty so that he would receive payments as he did under the 1837 treaty. 1842 Treaty, Schedule of claims, items 23, 33, and 48 at 545 (Plaintiffs' Ex. 65); *see also* 1837 treaty.

The court finds that the Chippewa did not consent to removal in the 1837 treaty and that the Chippewa did not understand that the treaty gave the President unfettered discretion to extinguish their privilege.

### III.

In 1841 Congress appropriated money for the expenses of treaty negotiations with Indian tribes for the purpose of extinguishing all of their title to lands in Michigan. Act of March 3, 1841, sec. 2, 5 Stat. 417, 419. In 1842 Robert Stuart was appointed to negotiate a treaty with the Chippewa, the only Indians still holding lands in Michigan. Commissioner of Indian Affairs T. Hartley Crawford told Stuart to purchase the land in the upper peninsula of Michigan and to expand the purchase to lands south of Lake Superior in present day Wisconsin.[10] Crawford to Stuart, Aug. 1, 1842 at 1 (Plaintiffs' Ex. 64). Crawford also told Stuart that the treaty should contain a provision for the eventual removal of the Chippewa from the territory, but stated that it "is not likely that it will be necessary for them to remove for a considerable time." *Id.* at 6–7.

The Chippewa were very upset when Stuart raised the issue of removal during the treaty negotiations. They initially refused to sign the treaty, but Stuart persuaded them to agree to the treaty by promising them that it would be a long time until they were removed and they could remain on their lands for an indefinite time. After the treaty was executed, Chief Martin from Lac Courte Oreilles stated:

> But I and my brother Chiefs refused to touch the pen, unless our half breed relations were provided for, and we should be permitted to remain on the land as long as we behaved well and are peaceable with our grand father & his white children.... [W]hen I touched the pen it was on consideration that my relations were provided for, and that we should remain on the land, as long as we are peaceable. We have no objection to the white man's working mines, & the timber and making farms, but we reserve the birch bar & cedar, for canoes, the rice and the sugar tree and the priviledge [sic] of hunting without being disturbed by the whites.

Brunson to Doty, Jan. 6, 1843 at 60 (Plaintiffs' Ex. 67).

The 1842 Treaty states in part:

Article II. The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.

Article VI. The Indians residing on the Mineral district shall be subject to removal therefrom at the pleasure of the President of the United States.

Although the Mille Lacs Band did not inhabit the lands ceded in the 1842 Treaty, three representatives of the Band signed it.

Implementation of the removal provision was discussed in 1842, but Stuart told Crawford that removing the Chippewa soon "was not in conformity with the spirit of the treaty." S.Doc. No. 403, 29th Cong., 1st Sess. 3,

---

**10.** These lands do not encompass any area under consideration in this case.

(1846) (Plaintiffs' Ex. 76). In 1844 Crawford opposed removal under the 1842 treaty:

the presence of the Chippewas will not interfere, for some time to come, with the mining operations of our citizens who may choose to engage in them. When it is found to do so, we can act; for the present, I would advise no step that could be tortured into harshness towards these poor people....

*Id.*

In 1846 Commissioner of Indian Affairs William Medill reported to the Senate that the government had not yet taken any action to implement the 1842 treaty removal provisions and that "in 1843 [Stuart], and in 1844 [Crawford], entertained doubts as to the expediency at that time of enforcing the power conferred by the treaty respecting removal". *Id.* Medill also asserted that the Chippewa would become civilized more quickly if the United States purchased their unceded lands east of the Mississippi and removed them to their lands to the west. 1846 ARCOIA 9 (Plaintiffs' Ex. 77). James Hays, the subagent at La Pointe, suggested that a new treaty be negotiated to purchase the lands east of the Mississippi that the Chippewa still owned and to provide for their removal. *Id.* at 46–47.

Isaac Verplank was appointed treaty commissioner for the negotiations. In a June 4, 1847 letter to him, Medill explained that the United States wanted to acquire a tract of land as a new home for the Winnebago, a tract of land as a new home for the Menominees, and the remaining lands east of the Mississippi still owned by the Chippewa. Medill to Verplank and Mix, June 4, 1847 at 1–2 (Plaintiffs' Ex. 78). Medill also explained that Verplank should obtain the consent of the Chippewa to move west. *Id.* at 2. He explained that the removal objective was a response to wrongful conduct by non-Indians:

[The Chippewa] are widely scattered and lead a roving and unsettled life and obtain subsistence principally by fishing and hunting. The government can exercise but

little, if any, supervision over them, and they are consequently accessible to whiskey sellers and other unprincipled men who exercise an evil influence over them, and by whom they are fleeced of their means, as well those acquired by themselves as those they receive from the government.

*Id.* at 10.

Medill further stated that:

A large proportion of [the Chippewa] east of the Mississippi yet remain by suffrage on lands ceded to the U. States by former treaties particularly those of July 29th 1837 and October 4th 1842.... These Indians are liable to be removed at any time to the lands yet unceded, and the progress of white population in Wisconsin will soon render this necessary.

*Id.* at 10. This statement overlooked the fact that the 1837 treaty did not contain a removal provision and was in conflict with the assurances given by Stuart during the 1842 treaty negotiations.

Medill also appears to have somewhat overstated the urgency of obtaining land for settlement. Although white settlement of the Minnesota portion of the 1837 territory had increased from 286 people in 1846 to 892 in 1850, the huge area was still relatively sparsely settled, and there was little agricultural settlement. White Report at 2:7–8. An appraiser hired by the United States to prepare a report for the Indian Claims Commission on the value of the 1837 cession area concluded that in 1850 it "remained as an uncharted wilderness area." Cleland Report at 92; *see also,* Squires Report at 17. A settlement boom in the 1850's later rapidly increased the white population to 6,664 by 1860, but settlement was still slight because of the large land area.[11] Squires Report at 17; Massmann Report at 50.

Medill also explained to Verplank:

so far as I am aware, it has been the impression that all the unceded lands of the Chippewa of Lake Superior and the Upper Mississippi as well as those east as

11. Most white Minnesota residents lived outside the 1837 ceded territory. The entire population of the whole Minnesota Territory was only 952 in

1840. By 1850 it had risen to 6,038, by 1857 it was 150,037, and by 1860 it was 169,395. White Report 2:6, 7.

those west of that river were the common property of the whole, but as you are aware, it has recently been represented that this is not the case, and that different bands claim the exclusive title to different portions of it.

Medill to Verplank and Mix, June 4, 1847 at 13 (Plaintiffs' Ex. 78). He instructed Verplank that he should avoid this issue if possible:

it is very desirable, however that no question of this kind be raised as it is a leading object with the department to consider the Chippewas and to have them think themselves one united people, with possessions and interest in common, especially for the future. And should you succeed in effecting a treaty with them, it should as far as possible be made clearly and unequivocally to express this meaning and intention.

*Id.* at 13–14.

Verplank and Henry Rice conducted the negotiations. Rice was a member of one of the successors to the American Fur Company, the Upper Mississippi Outfit, and he had helped the agent for the Winnebago choose the location of their new home in Minnesota. His presence at the treaty negotiations was necessary because he was very influential with several chiefs and "no treaty could be made while he was in the country against his wishes." Verplank to Medill, July 10, 1847 at 2 (Plaintiffs' Ex. 129).

The treaty negotiations did not result in an agreement about removal or the cession of any lands east of the Mississippi. Verplank to Medill, Sept. 10, 1847 (Plaintiffs' Ex. 79). Verplank was also unable to maintain the fiction of a single Chippewa nation. The 1847 treaty did cede the lands west of the Mississippi that the government wanted for the Winnebago, but only on the condition that the Chippewa of the Mississippi would receive $63,000 of the annuity compensation [12] and the Lake Superior Chippewa only $17,000, based on the rationale that it was the Mississippi Chippewa who actually had used the land to be ceded. Cleland Report at 80. Annuity payments for land ceded

under the 1837 and 1842 treaties had been paid to the Mississippi Chippewa and Lake Superior Chippewa on a per capita basis regardless of which tribes actually used the land. Cleland Report at 80–81. As a result, the Lake Superior Chippewa felt cheated by the new arrangement. *Id.*

Although the United States classified the Mille Lacs Band as a part of the Mississippi Chippewa, and the Band could have benefited from the split annuity approach, a Mille Lacs chief, Naqwanabe, led opposition to the treaty and refused to sign it. Cleland Report at 81–82. This did not prevent the treaty from being concluded, but the position taken by the Mille Lacs Band during the 1847 treaty negotiations led to less cordial relations between it, the other Mississippi Bands, and the United States. Cleland Report at 82.

### IV.

Commissioner Medill in his 1847 and 1848 annual reports continued to advocate purchase of the lands owned by the Chippewa east of the Mississippi and their removal. 1847 ARCOIA 8–9 (Plaintiffs' Ex. 80); 1848 ARCOIA 388 (Plaintiffs' Ex. 81). The 1847 report also included a report from sub-agent Hays that a St. Croix Indian had killed a white man, but had been acquitted for self-defense. He also reported an altercation between members of the Wisconsin River and Pelican Lake bands and several whites who had sold them liquor. He states:

This is the first instance of an Indian raising his hand against a white man on Lake Superior, which has ever come within my knowledge; but it is no more than I expect under the circumstances. If men will pursue this [liquor] traffic, they must look for such results, and have not right to complain or receive sympathy. The Chippewas as individuals, and as a nation, are well disposed, and will continue to be so as long as the cupidity and heartlessness of the whiskey dealer will permit. I fear that, in our accounts of outrages and

12. Annuity payments were owed Indians under treaties and were given in cash or in goods. In order to receive them Indians had to travel to

their agency, an area branch of the Office of Indian Affairs. Annuities were normally paid annually.

802

crime, we have done the Chippewas, if no other tribe, injustice in many cases; for I find on comparing them with almost any civilized community of the same size, for four years, there will be found the smaller aggregate of crime on the part of the savage; and every crime of any magnitude, which has been committed may be traced to the influence of the white man.

1847 ARCOIA 92–93 (Plaintiffs' Ex. 80).

In September of 1847, Wisconsin Territorial Governor Henry Dodge wrote to Commissioner Medill recommending removal of the Chippewa to the west of the Mississippi in response to complaints of his citizens that the "Sioux and other Indians" had been committing depredations." Dodge to Medill, Sept. 7, 1847 (State's Ex. 2 at n. 74). Despite the stated positions of Medill and Dodge, Medill did not try again to negotiate a treaty to obtain removal or for the cession of Chippewa lands east of the Mississippi.

The Chippewa, their missionaries, and local citizens opposed removal, arguing that the land was not needed for settlement. For example, in August 1848 missionary Sherman Hall wrote from La Pointe:

I *feel certain* that this region is not to be settled very extensively at present. There is too much good land in a better climate unoccupied, which will attract farmers before these barren regions. We have a healthy climate and some tolerable soil, but neither are particularly inviting to farmers. The mining excitement has in a great measure subsided, and most who have engaged in the business have found it a more serious and expensive business operation to dig copper, than they anticipated. There may be valuable mines in the country, but they do not exist everywhere, as was for a time supposed. I see no particular motive therefore to call a great number of settlers to this region at present. Why then should the Indians be required to remove? Nevertheless they may be.

Hall to Treat, Aug. 12, 1848 at 4 (emphasis in original) (Plaintiffs' Ex. 181).

In the fall of 1848, several representatives of the Lake Superior Chippewa went to Washington, D.C. to argue against removal.

They spoke to President James Polk, Congress, the Secretary of War, and the Commissioner of Indian Affairs. *Congressional Globe*, 30th Cong., 2d Sess. 536 (1849) (Plaintiffs' Ex. 182). Iowa Senator Augustus Dodge stated, "everywhere their mission was approved by all who became acquainted with them, and everywhere they excited the best sympathies of the human heart." *Id.*

On February 7, 1849, the Lake Superior Chippewa presented a petition to Congress arguing that they should not be removed:

We do not ... wish to be driven north of the British line, nor West among the wandering and vicious tribes which infest the plains and mountains stretching from the Mississippi to the Pacific. One or the other of these events will be certain to ensue unless our prayer be granted by the great council of this nation. Either would be fatal to us, and we should never cease to regret that our white brothers had dealt so hardly by us.

Petition of the Chief of the Chippewa Tribe of Indians on Lake Superior for a Grant of Lands, etc., Feb. 7, 1849 (State's Ex. 6 at n. 19).

In September 1849, Alexander Ramsey, the new Governor of the Minnesota Territory, began to argue that the Chippewa should be removed. He argued "[m]uch complaint is made by the settlers about Sauk Rapids, Swan River [etc.] as to the demoralizing effects of the privilege given the Chippewas, in the Treaty of 1837, to hunt and fish upon the lands ceded by said Treaty." White Report at 4:5.

Ramsey's argument was not supported by records of complaints that the Chippewa had committed depredations. In a June 27, 1849 letter to Ramsey, Commissioner of Indian Affairs Medill listed seven depredation claims filed by settlers. Medill to Ramsey, June 27, 1849 (Plaintiffs' Ex. 185). Only one of the seven claims was asserted against a Chippewa. *Id.* That claim alleged that a Chippewa had killed a colt. *Id.* The remaining claims were against the Winnebago. *Id.*

Only a few weeks later, James Fletcher, the agent for the Winnebago and the Missis-

sippi bands of Chippewa, contradicted Ramsey in his annual report:

> Chippewas of the Mississippi—These bands contain a population of about eleven hundred, and have their villages at Gull lake, Sandy lake, Mille Lac, and Rabbit lake. Respecting the former character of these Indians I know but little; but since they have been under my charge, for the year past, I have found them peaceable, temperate, and industrious.

Cleland Report at 96. Daniel Stanchfield, a Rum River valley lumberman, agreed that the Chippewa were well behaved and wrote that they "have been found more true and honorable than most white men with whom I came in contact on the frontier." D. Stanchfield, History of Pioneer Lumbering on the Upper Mississippi and its Tributaries, *Minnesota Historical Society*, vol. 9, at 332 (1901) (Plaintiffs' Ex. 32).

Minnesota politicians, including Ramsey, advocated removal of the Wisconsin Chippewa to Minnesota because they wanted to obtain more of the economic benefits generated by having a large number of Indians residing in their territory. If the Wisconsin Chippewa were removed to Minnesota, then Minnesota traders would be more likely to benefit from the annuity payments made to the Indians, Minnesota businesses would be able to compete for the lucrative business of supplying and transporting annuity goods, and Minnesota would receive money from Indian agencies for their operations and for schools, farms, and blacksmith establishments. Cleland Report at 93–95. The conclusion that Ramsey's primary motivation for advocating removal of the Chippewa to Minnesota was economic is supported by his decision not to advocate removal of the Winnebago from Minnesota when they were the subject of far more depredation complaints. White Report at 4:2–5.

On October 11, 1849, the Minnesota territorial legislature approved a resolution "to ensure the security and tranquility of the white settlements in an expansive and valuable district of this territory, the Chippewa Indians should be removed from all lands within the Territory to which the Indian Title has been extinguished, and [ ] the privileges given to them by Article Five [of the 1837 treaty] and Article Second of the [1842 Treaty] should be revoked." Ramsey to Ewing, enclosing Joint Resolution of Territorial Assembly, Nov. 7, 1849 (Plaintiffs' Ex. 86). All of the land ceded in the 1842 territory was located in Michigan and Wisconsin.

Henry Rice put it clearly in a confidential December 1, 1849 letter to Ramsey which demonstrates the economic motivation behind this removal effort:

> The Chippewas of Lake Superior in 1842 sold all of their country south of that lake. Their Agency is on a barren island in the lake, and out of their own Country. They should be removed from the ceded lands. They should receive their annuities on the Mississippi River, say at or near Sandy Lake, at which place an agency for the whole tribe should be established. This would better accommodate the whole tribe and Minnesota would reap the benefit whereas now their annuities pass via Detroit and not one dollar do our inhabitants get altho' we are subject to all the annoyance given by those Indians.

Rice to Ramsey, Dec. 1, 1849 at 2–3 (Plaintiffs' Ex. 87).

In December of 1849 and January of 1850, Ramsey and Rice were in Washington, D.C. urging the President to issue a removal order. The 1849 report prepared by Commissioner of Indian Affairs Brown continued to advance Medill's position that many Chippewa remained on ceded lands by sufferance and would have to remove whenever required by the President. 1849 ARCOIA 943–44 (Plaintiffs' Ex. 84). He added "longer residence [of the Chippewa on the ceded lands] is incompatible with the tranquility and interest of our citizens, who suffer annoyance and loss from their depredation", but he did not provide any descriptions of depredations by the Chippewa. *Id.*

On February 6, 1850, President Zachary Taylor issued the following executive order:

> The privileges granted temporarily to the Chippewa Indians of the Mississippi by the fifth article of the treaty made with them on the 29th of July 1837 "of hunting, fishing and gathering the wild rice, upon the

lands, the rivers and the lakes included in the territory ceded" by that treaty to the United States ... are hereby revoked; and all of the said Indians remaining on the land ceded aforesaid, are required to remove to their unceded lands.

Executive order, Feb. 6, 1850 (Plaintiffs' Ex. 191). Commissioner Brown sent the order to Ramsey on the same day. The only explanation for the order given in the accompanying letter was that "[t]he policy of the measure here referred to is announced in my late annual report, and its execution during the present year has been determined on." Brown to Ramsey, Feb. 6, 1850 at 1 (Plaintiffs' Ex. 88) The letter also stated that Ramsey should choose a new location for the La Pointe agency and suggested that it be somewhere on the Mississippi. *Id.* at 2.

Neither the instructions sent from Commissioner Brown to Ramsey nor those sent from Ramsey to the agents who would oversee the removal discussed any implementation measures to revoke hunting, fishing, and gathering rights. *Id.;* Ramsey to Livermore, March 4, 1850 (Plaintiffs' Ex. 194). In fact, when sub-agent Livermore responded to Ramsey's instructions, he assumed that the Chippewa would return to their ceded lands after removal to hunt and fish: "Let five thousand Indians be crowded into the small Territory they call their own, and they will subsist as long as they are fed by Government, after which, they would starve or flee back to their old haunts." Livermore to Ramsey, March 26, 1850 (Plaintiffs' Ex. 199).

The executive order was not necessary to provide land for settlement in 1850 as indicated in a Feb. 25, 1850 letter from S. Hall to Rev. S.B. Treat, a missionary:

It is thought by some that the Indians will not be required to remove from this immediate vicinity immediately, as there are no inhabitants who urge their removal. The land is not wanted for settlement. Most of those here would prefer that they remain on account of the fish and fur trade.

Hall to Treat, Feb. 25, 1850 at 3 (Plaintiffs' Ex. 90). The white population of the Minnesota Territory was 6,038, but only 892 of them lived in the 1837 ceded territory. *See infra* at 800–801.

The Chippewa opposed removal because they did not want to leave their homes, burial grounds, and territories where they hunted, fished, and gathered. They also opposed removal because the new territory chosen by the government was occupied by other bands who had not agreed to receive them. Livermore to Ramsey, March 26, 1850 (Plaintiffs' Ex. 199). Both Indians and non-Indians believed that the new lands were insufficient to support the number of Chippewa who would be removed and those already living there. *Id.;* C. Beaulieu to Borup, April 25, 1850 (Plaintiffs' Ex. 203).

The Chippewa believed that the executive order was not authorized by either the 1837 or 1842 treaties and that it violated the assurances given by Stuart during the 1842 negotiations. *See, e.g.,* Eds., Minnesota Chronicle and Register, March 9, 1850 (Plaintiffs' Ex. 196); Eds., Minnesota Pioneer, March 20, 1850 (Plaintiffs' Ex. 198); Letter from Livermore to Brown, April 10, 1850 (Plaintiffs' Ex. 68); A Chippewa Address, Swan River, June 30, 1851 at 2 (Plaintiffs' Ex. 72); Buffalo, et al. to Lea, Nov. 6, 1851 (Plaintiffs' Ex. 73). They continued to believe that they could be removed only if they misbehaved. Mendenhall to Lea, Jan. 6, 1851 at 5–6 (Plaintiffs' Ex. 69).

Missionaries and local citizens confirmed this understanding, and government officials conveyed it to their superiors. For example, a January 21, 1851 letter from the Secretary of the American Board of Commissioners for Foreign Missions to the Commissioner of Indian Affairs stated:

It was the declared wish of Government when the treaty of 1842 was made, to obtain the control of the mineral lands, in the possession of the Ojibwas, and not to purchase their territory for agricultural purposes. The Indians were told that they could remain where they were for an indefinite period, except so far as they might be required to give place to miners; and the Commissioners said to them. "You and I shall never see the day when your Great Father will ask you to remove. Had it not been for this assurance, it is presumed, the

treaty would never have been consummated. [no end quotation given] Treat to Lea, Jan. 21, 1851 at 2 (Plaintiffs' Ex. 70). This understanding was corroborated by Cyrus Mendenhall, a miner present at the 1842 treaty negotiations, W.W. Warren, a farmer hired by the government to teach the Chippewa, and Indian Agent Henry Gilbert in his 1853 report to the Commissioner of Indian Affairs. Mendenhall to Lea, Jan. 6, 1851 at 5–6 (Plaintiffs' Ex. 69); W. Warren to Ramsey, Jan. 21, 1851 at 2–3 (Plaintiffs' Ex. 71); Gilbert to Manypenny, Dec. 14, 1853 at 4 (Plaintiffs' Ex. 75).

The government decided to encourage the Chippewa to remove by moving the La Pointe agency to Sandy Lake in the Minnesota Territory and paying annuities only at Sandy Lake. Brown to Ramsey, March 26, 1850 at 2 (Plaintiffs' Ex. 200). The sub-agent at La Pointe prepared a circular to notify the Chippewa about the executive order and the movement of annuity payments to Sandy Lake. Livermore to Ramsey, April 2, 1850 (Plaintiffs' Ex. 201). The circular did not mention the portion of the order purporting to revoke the hunting, fishing, and gathering privilege. Livermore to Ramsey, April 2, 1850 (Plaintiffs' Ex. 201).

On July 15, 1850, Ramsey wrote to the new Commissioner of Indian Affairs, Luke Lea, that the annuity payment would be made at Sandy Lake and timed "in such a way as to interpose obstacles to a return to the country they left." Ramsey to Lea, July 16, 1850 at 6 (Plaintiffs' Ex. 207).

Ramsey wrote to Lea twice in August requesting provisions to give the Chippewa who removed during the winter, but no response was received by September 23, 1850, when Agent Watrous told the Lake Superior bands that they had to be at Sandy Lake on October 25 for their payments. White Report at 6:6. On September 30, 1850, $25,000 was appropriated to the Indian Department "for expenses of removal and subsistence of the Chippewas of Lake Superior and Mississippi from the lands ceded under the [1842] Treaty." 9 Stat. 544 (State's Ex. 24).

By November 10 almost 4,000 Chippewa had gathered at Sandy Lake, but Watrous did not arrive until November 24, and the annuity goods were not distributed until Dec. 2, 1850. Measles and dysentery broke out while the Chippewa were waiting for Watrous, and many died. Watrous estimated that not less than 150 Chippewa died, but Chief Buffalo's estimate was 170. Watrous to Ramsey, Dec. 10, 1850 (Plaintiffs' Ex. 210); Buffalo et al., to Lea, Nov. 6, 1851 at 291 (Plaintiffs' Ex. 73). The difficult trip home during winter caused 230 more deaths. Buffalo et al., to Lea, Nov. 6, 1851 at 291 (Plaintiffs' Ex. 73). On February 27, 1851, an additional $25,000 was appropriated "[f]or expenses of removal and subsistence of the *Chippewa of Lake Superior and the Mississippi* from the lands ceded under the Treaties of [1837] and [1842]." 9 Stat. 570 (State's Ex. 25).

The Sandy Lake annuity payment experience intensified the opposition of the Chippewa to removal. In a January 21, 1851 letter to Ramsey, William Warren wrote:

Not only in their councils, but throughout the whole length of my journey I heard in every lodge and from the mouth of every man and woman a determination expressed not to remove.

. . . . .

Since the order for removal has been promulgated other causes have unhappily arisen which had infinitely strengthened in the minds of the Indians a determination not to remove. I have reference [sic] to their being summoned to Sandy Lake to receive their annuity payment when through unavoidable circumstances, they were detained on short allowance of provisions a long length of time, and during their best hunting season. They were made to suffer severely from the cold for want of their goods, which could not be paid to them till their agent had returned from St. Louis to procure their money annuity. Sickness also made its appearance amongst them and in this totally destitute condition cut off nearly two hundred of their number. All this, together with the non-payment of their money, is looked on by them, but as a foretaste of the consequences of their removal, and of the country to which they believe they are to be removed.

W. Warren to Ramsey, Jan. 21, 1851 at 2–4 (Plaintiffs' Ex. 71).

On June 3, 1851 the new Commissioner of Indian Affairs, Luke Lea, reviewed the removal effort and concluded that the removal of the Chippewa was "not required by the interest of the citizens or Government of the United States and would in its consequences be disastrous to the Indians." Lea to Stuart, June 3, 1851 (Plaintiffs' Ex. 94). He wrote:

> In view of the weighty reasons in the communications referred to from which it appears that the removal of the Anse, Vieux Deser, Ontonagon, Kewanenon, La Pointe and Bad River bands of Chippewa is not required by the interests of the citizens or Government of the United States and would in its consequences in all probability be disastrous to the Indians, I recommend that the order of the President be so modified as to permit such portions of these bands as may desire it to remain for the present in the country they now occupy.

Lea to Stuart, June 3, 1851 (Plaintiffs' Ex. 94). Lea did not mention revocation of the hunting, fishing, and gathering privilege guaranteed in the 1837 treaty.

Watrous continued to try to remove the Chippewa and informed Lea that troops would be necessary. On August 23, 1851, the Acting Commissioner of Indian Affairs, Charles Mix, wrote to the Secretary of Interior:

> I have the honor to state that a dispatch from Agent Watrous, dated at Lapointe, 18th instant, stating that one thousand Chippewa were there assembled and that he could not remove them without the aid of Troops, has been received at this office. It is proper, therefore, that I should call your attention to a communication which was addressed to the Hon. Secretary of the Interior, by Commissioner Lea, on the 3rd June last, in which, in view of the disastrous consequences that in all probability would flow by reason of the removal of these Indians it was recommended "that the order of the President be so modified as to permit such portions of these bands as may desire it to remain for the present in the Country they now occupy."

> As no action known to this office has been had in reference to the recommendation of Commissioner Lea, under the circumstances referred to in the dispatch from Agent Watrous, I beg leave to recommend that I may be authorized to instruct Agent Watrous to suspend the removal of these Indians until the determination of the President upon the recommendation of the Commissioner, is made known to this office.

Mix to Graham, Aug. 23, 1851 (Plaintiffs' Ex. 221).

Removal efforts were soon suspended. On August 25, 1851, the Acting Secretary of the Interior responded that the Commissioner could tell Watrous to suspend removal of the Chippewa Indians until the final determination of the President on the subject. Graham to Commissioner, Aug. 25, 1851 (Plaintiffs' Ex. 95). Commissioner Lea sent a telegram to Watrous on the same day stating, "[s]uspend action with respect to the removal of the Lake Superior Chippewas for further orders." Lea to Watrous, Aug. 25, 1851 (Plaintiffs' Ex. 95) at 2. On September 5, Lea wrote to Selah Treat that:

> [U]pon recommendation of this office, the Secretary of the Interior, on the 25th ult. directed a suspension of the removal of the Chippewas until the final determination of the President, as to whether they should be permitted to remain or their removal resumed, should be made known. Agent Watrous was apprized [sic] by telegraph on the same day.

Lea to Treat, Sept. 5, 1851 (Plaintiffs' Ex. 106). On September 18, 1851, William Boutwell, who had been hired by Watrous to assist with the removal, told Ramsey that "on the 3d of Sept. a telegraphic dispatch came to hand viz. 'Suspend active operations in the removal of the Chippewa.' The purport of the order remains a secret & as the Inds. are ready to go I shall start." Boutwell to Ramsey, Sept. 18, 1851 (Plaintiffs' Ex. 171).

Despite efforts by Watrous to remove the Chippewa and his report that the process was nearly complete, very few Chippewa were actually removed. Most returned to their homes, and in November of 1852 Rever-

end Wheeler stated, "No one in the country needs to be told now the recent effort to remove the Indians is a failure." Wheeler to Treat, Nov. 20, 1852.

In the November 27, 1851 annual report, Commissioner Lea stated that many Chippewa had not been removed and that many who had been removed would return to their old hunting grounds. In a December 26, 1851 letter to Lea, Ramsey explained that the Indians who had not yet been removed did not need to be removed, "Again, in the instance of these Indians, no pressing necessity exists for their immediate removal, so far as the interests, rights, prejudices even of our citizens are concerned, who inhabit the lands which they have ceded, but continue to occupy." Ramsey to Lea, Dec. 26, 1851.

In June of 1852 Watrous suggested to Commissioner Lea that any Chippewa who had refused to remove should be denied their annuity payments, but that the L'Ance band should be exempt from this policy. Watrous to Lea, June 7, 1852 (Plaintiffs' Ex. 231). On June 19, 1852, Commissioner Lea wrote to Ramsey that he was authorized to decide whether to implement a policy of paying only those who removed with any appropriate exceptions. Lea to Ramsey, June 19, 1852 (Plaintiffs' Ex. 233). Ramsey decided to adopt the policy recommended by Watrous and told Watrous, "You will therefore announce to all of them, that if they wish in future to participate in the annuities of the tribe they will be expected to remove off the ceded lands, & within the lines of their own country." Ramsey to Watrous, Aug. 9, 1852 (Plaintiffs' Ex. 235).

Ramsey and Watrous continued to encourage removal of the Chippewa through their annuity payment policy and Commissioner Lea endorsed this approach:

A considerable number of the Chippewas yet remain at their old homes in the country ceded to the United States, but by adhering to the policy of paying them their annuities only in their own territory, it is thought that such of them as it may be desirable to remove will soon be induced quickly to abandon their ceded lands.

1852 ARCOIA (State's Ex. 6, n. 77). There is no record that either Ramsey or Watrous received any reprimand for their policies.

Despite this policy, the Chippewa decided to remain on their lands and to continue to hunt, fish, and gather. To compensate for annuities lost because of this decision, Reverend Wheeler told Treat that "more of them than usual have gone a hunting, their furs bringing them the ready cash or its equivalent in something else." Wheeler to Treat, Nov. 20, 1852 at 1 (Plaintiffs' Ex. 105). In April 1853, a mission employee from La Pointe wrote that the Chippewa were making maple sugar. Pulsifer to Treat, April 14, 1853 at 1 (Plaintiffs' Ex. 118).

In June of 1852 Benjamin Armstrong accompanied a delegation of Chippewa led by Chief Buffalo to Washington, D.C. to urge President Fillmore to give them a document expressly canceling the 1850 executive order. Armstrong later wrote that the delegation was successful, but there is no record of a revocation document. Armstrong's account of meeting with the President appears to contain factual errors about other details indicating that the entire source may not be very reliable. Driben Report on Armstrong. *See also* Cleland Report at 109.

The Chippewa continued to express concern about removal after 1851, but this is not surprising considering that Ramsey continued to tell them that they would have to remove. *See, e.g.*, Gilbert to Manypenny, Dec. 10, 1853 (State's Ex. 6 n. 82); Chippewa to Commissioner of Indian Affairs (COIA), Oct. 24, 1853 (State's Ex. 6 n. 80); Buffalo and Oshoga to Ramsey, July 23, 1852 (Plaintiffs' Ex. 111); Ramsey to Buffalo and Oshoga, Aug. 10, 1852 (Plaintiffs' Ex. 112). However, even Mr. Newell, an historian called to testify by the State, concluded "Federal efforts to remove the Lake Superior Chippewa to the Mississippi River effectively ended in the summer of 1851." Newell Report at 30. Sherman Hall presented his observations about the attempt to remove the Chippewa in a 1858 lecture and was reported to have said, "[g]reat efforts were made to effect their removal, but the sequel proved their attachment too strong for the particular locally of their birth to make it an easy matter and the

policy was abandoned by the government." Sauk Rapids Frontiersman, April 18, 1858 (Plaintiffs' Ex. 26).

In 1853 President Franklin Pierce took office. The Pierce administration replaced the removal policy with a policy of creating reservations for the Chippewa on lands ceded in earlier treaties. The new Commissioner of Indian Affairs, George Manypenny, believed that the use of reservations would allow Indians to learn the necessary skills to assimilate into Euro–American society while protecting them from the bad influences of traders and liquor dealers.

In 1853 the Chippewa began to receive their annuity payments at La Pointe and St. Croix. See, e.g., Gorman to Manypenny, Oct. 8, 1853 (Plaintiffs' Ex. 119) at 2; Wheeler to Parents, Oct. 20, 1853 (Plaintiffs' Ex. 120); Herriman to Gorman, Nov. 10, 1853 (Plaintiffs' Ex. 122); Gorman to Oakes, Nov. 15, 1853 (Plaintiffs' Ex. 123); Gorman to Beaulieu, Dec. 3, 1853 (Plaintiffs' Ex. 124). Although Acting Commissioner of Indian Affairs Charles Mix wrote that the Chippewa who had not removed as ordered should not receive their annuities, even such a passive removal policy was effectively extinguished after payments were made at La Pointe and St. Croix. Mix to Gorman, Oct. 21, 1853. The annuity payments included cloth, calico, powder, lead, shot, flour, and pork. Gorman to Beaulieu, Dec. 3, 1853 (Plaintiffs' Ex. 124). After the La Pointe payment, Agent Henry Gilbert wrote to Manypenny to convey the request from the Chippewa that their annuity payments include guns, camp kettles, traps, cooking stoves, and cooking utensils. Gilbert to Manypenny, May 27, 1854 (Plaintiffs' Ex. 121). He also recommended that guns and camp kettles be substituted for some dry goods in the 1854 payment because they "are so obviously necessary for them." Gilbert to Manypenny, May 27, 1854 (Plaintiffs' Ex. 121).

After the October 1853 annuity payment at La Pointe, Reverend Wheeler wrote to his father:

It is now almost certain that no further attempts will be made to remove these Indians. There is but little doubt that the old order of things will be restored. That the farmers, carpenters, blacksmiths will be given back to them, & missionaries be encouraged to on with their labors as formerly. The late efforts to remove the Indians [have] not only proved a failure, but are now clearly seen by the Department at Washington to have originated with a few designing men who wanted the Indians removed that they might get their money.

Wheeler to Father, Oct. 27, 1853 (Plaintiffs' Ex. 99).

The Special Agent who made the La Pointe payment, Henry Gilbert, reported that the Chippewa wanted their annuity payments to be made at La Pointe instead of Sandy Lake. Gilbert to Manypenny, Dec. 14, 1853 at 5 (Plaintiffs' Ex. 75). "As the change from La Pointe was only an incident of the order for removal & intended as I supposed to render that order more easy of execution I assured them of my belief that their future payments would be made at points easy of access to them all." Id. Gilbert also recommended that the policy of removing the Chippewa be abandoned:

I deem it important not only that the policy of removal should be abandoned but that such a determination on the part of the United States should be communicated to them in an official form. They can then acquire lands & make settlements & improvements unmolested by the fear of being driven from their homes which has paralyzed their energies & thwarted the labors & efforts of missionaries & teachers for several years.

Gilbert to Manypenny, Dec. 14, 1853 at 4 (Plaintiffs' Ex. 75).

In the 1854 Annual Report Commissioner Manypenny adopted Gilbert's recommendation and indicated that reservations should be established for the Chippewa who were still living in the lands ceded by the 1837 and 1842 treaties:

There are, however, within the limits of Wisconsin, and also within the northern peninsula of Michigan, a few small bands of the Chippewas of Lake Superior, who still occupy their former locations on lands ceded by the treaties of 1837 and 1842. It

has not, thus far, been found necessary or practicable to remove them. They are very unwilling to relinquish their present residences, as are all the other bands of the same Indians; and it may be necessary to permit them all to remain, in order to acquire a cession of the large tract of country they still own east of the Mississippi, which, on account of its great mineral resources, it is an object of material importance to obtain. They would require but small reservations; and thus permanently settled, the efforts made for their improvement will be rendered more effectual.

1854 ARCOIA 212–13 (Plaintiffs' Ex. 23).

Even during the height of the removal effort, the government did not designate for removal bands living along the shores of Mille Lacs Lake. The removal effort focused on the six bands who occupied the Wisconsin portion of the 1837 and 1842 ceded territories. Cleland Report at 99. The objective was to move those Wisconsin bands to Minnesota. Cleland Report at 182. In fact, both Governor Ramsey and Agent Watrous discussed moving bands to the Lake Mille Lacs area and providing them with farmers and other assistance there. Cleland Report at 103. Some members of the St. Croix band were eventually moved to Mille Lacs, and a farmer was placed there in 1851. White Report at 14:1.

Both Dr. Cleland and Dr. White testified persuasively that it would have been very unlikely that the Mille Lacs band received the circular which had been prepared to inform the Chippewa of the 1850 executive order because it had not been one of the bands targeted for removal. Cleland Report at 182; White Report at 5:8. Moreover, no instructions about the 1850 executive order were sent to the agent responsible for the Mille Lacs Band when they were sent to the agent at La Pointe. White Report at 5:4.

The Mille Lacs bands received their annuity payments for 1850 and 1851 at Sandy Lake while they continued to reside at Mille Lacs. White Report at 8:14. In 1850 the Mille Lacs bands received tools, oxen, and a plough after Governor Ramsey approved this use of their annuity funds. White Supp.

Report at 11–12. In the 1850 annual report Governor Ramsey described the Mille Lacs Band:

The Mille Lac band number about three hundred. Being removed forty or fifty miles from any white settlement, and possessing a lake abounding in fish and wild rice, and bordered by extensive maple groves, they live amid greater plenty than any of their surrounding brethren.

1850 ARCOIA 87–88 (Plaintiffs' Ex. 100).

On February 10, 1851, Governor Ramsey wrote to Agent Watrous to recommend that the efforts of the Mille Lacs Band to increase their farming be encouraged:

At Mille Lac and Rabbit River the Indians have for some years evinced an improving disposition, and have themselves maintained at these points small farms. Here, as it can be done with slight expense, I would advise you to encourage and stimulate their efforts, by furnishing them, at each of those localities, from one to two yoke of oxen, and if needed seek potatoes, etc. It might also be well to furnish them a laborer to do breaking and by personal visit if possible manifest an interest in their farming operations.

Ramsey to Watrous, Feb. 10, 1851 (Plaintiffs' Ex. 16). These suggestions were implemented. White Report at 7:3, 5. If Governor Ramsey had believed that the executive order applied to the Mille Lacs Band, he would not have taken these actions.

The behavior of Agent Watrous also indicates that he did not believe the executive order applied to the Mille Lacs Band. He visited Mille Lacs in May of 1851 and found that 50 members of the Snake River band had moved there, but he did not suggest that these Indians should be required to leave Mille Lacs. White Report at 7:8.

In 1849, lumbermen built a dam on the Rum River near its source, Mille Lacs Lake. The dam caused flooding in an important wild rice bed, causing conflict between the lumbermen and the Band. Cleland at 120. The Rum River was considered "the most desirable point for lumbering" in Minnesota, partly because the Chippewa supplied lumbermen with venison, fish, fowl, wild rice,

maple sugar, and wild berries, and the conduct of the Chippewa was praised. St. Anthony Express, Jan. 31, 1852 (Plaintiffs' Ex. 101); St. Paul Weekly Minnesotan, Feb. 7, 1852 (Plaintiffs' Ex. 48). Nevertheless, during the spring of 1854 the Chippewa lowered the water level of the dam and threatened to tear it out. *Id.* Governor Gorman sent a representative to Mille Lacs after this crisis, and the dam remained in place. *Id.* In February of 1855, a clash between lumbermen and Band members resulted in the death of one Chippewa and two lumbermen.

In 1855 Governor Gorman described to Commissioner Manypenny the competing interests:

> The lands occupied by the timbermen have been surveyed and sold by the United States and the Indians have no other treaty interests except hunting and fishing and I do not think their land extends to the point at which our citizens are operating in the pineries, at least I am informed by the oldest citizens most familiar with the lines separating the Indian community from the ceded lands, that out citizens are seven mile south of the extreme southern line of the Indian boundary.

Gorman to Manypenny, Feb. 16, 1855 at 3 (Plaintiffs' Ex. 17). Gorman, a lawyer, was *ex officio* Superintendent of Indian Affairs for the Minnesota Territory. White Report at 12:1–2. His opinion that the Mille Lacs Band retained its reserved privileges under the 1837 treaty is compelling contemporaneous evidence that they were not revoked by the 1850 executive order.

Lieutenant J. Hamilton, who led 25 federal soldiers to intervene in the February 1855 crisis, also indicated that the Mille Lacs Band's reserved hunting, fishing, and gathering privilege under the 1837 treaty continued to exist in 1855:

> The last matter touched on in Council of Saturday was the question of the sluice dam just below their Wild Rice Lake—It

was treated that the lumbermen would be permitted to complete their dam and use it for their purposes as late as the Governor had arranged for last year, that then as their Chiefs were to be home from Washington the responsibility would fall on them.—

In excuse for this loose arrangement I would say that I had no copy of the treaty with me—that many lumbermen thought that the treaty insured protection to their rice crops—that all the Indians so understood it, and last and most-powerful was the reason that this has been an unsettled matter for 5 years, during which time from 5 to 10 opportunities have transpired for settling it and the neglect of which is much complained of by proprietors along the river—I did not feel justified in forcing from the Indians a right they had never ceded.

Hamilton to Stewart, March 9, 1855 at 4–5 (Plaintiffs' Ex. 18). Dr. Cleland and Dr. McClurken testified that they believed Hamilton was referring to the 1837 treaty and not to the treaty negotiations occurring simultaneously in Washington, D.C.

In a June 4, 1855 letter to Chief Little Hill Gorman stated, "[The dam] is not on your land, and if it was, it was put there before you had any rights there except to hunt and fish." Gorman to Little Hill, June 4, 1855 (Plaintiffs' Ex. 19). A June 1855 petition from non-Indians to Governor Gorman also states that the lumbermen used the lands flooded by the dam for six years "before the occupancy of said lands or any part of them (except for hunting and fishing) was granted to the Indians by the Treaty of 1855." Petition, W. Garland et al. to Gov. Gorman, June 4, 1855 at 5 (Plaintiffs' Ex. 20). The Rum River dispute was eventually resolved when the lumbermen agreed to compensate the Band for the loss of its rice crop.[13] McCleland to Mix, July 2, 1855 (Plaintiffs' Ex. 21).

Based on all of this evidence, the court finds that the 1850 executive order was sus-

---

13. The State argues that the Band's wild rice claim was based on the beds being part of the newly created reservation rather than on the 1837 treaty. This conclusion is drawn from a 1855 letter from Acting Commissioner of Indian Affairs Mix to Gorman. In that letter Mix ob-

served that damage had been caused on reservation property and that the Band should therefore be compensated. He did not comment on whether the Band was also entitled to compensation under the 1837 treaty.

pended and that it never applied to the Mille Lacs Band.

## V.

The United States decided to seek a treaty extinguishing Indian title to all lands in Minnesota and Wisconsin and to settle the bands on reservations. An authorization act was debated in May of 1854, but it did not pass the Senate. Cong.Globe, 33rd Cong., 1st Sess. 1032 (1854) (Plaintiffs' Ex. 126). The proposed act stated that "the Laws of the United States and the Territory of Minnesota shall be extended over the Chippewa territory in Minnesota whenever the same may be ceded, and the same shall cease to be Indian country." 10 Stat. 598. During the debate the sponsor of the bill, Congressman Orr, argued that "we have had experience enough that the policy which we have heretofore pursued of extinguishing the title to the Indian lands, removing them further West, and paying them large money annuities, has been demonstrated by experiment to be an utter failure." Cong.Globe, 33rd Cong., 1st Sess., 1032 (1854) (Plaintiffs' Ex. 126). Although the bill had not yet passed the Senate in August of 1854, Commissioner Manypenny initiated the treaty process. Cleland Report at 130.

On August 11, 1854, Manypenny instructed Agent Gilbert to begin negotiations for the purchase of "all the country [the Chippewa] now own or claim in the territory of Minnesota, the State of Wisconsin or elsewhere" except for an amount of land that would be used for reservations. Manypenny to Gilbert, Aug. 11, 1854 at 1 (Plaintiffs' Ex. 131). On August 12, 1854, Manypenny instructed Gilbert to cancel provisions for smiths and farmers under earlier treaties in the new treaty, but he did not instruct Gilbert to cancel any reserved usufructuary rights. Manypenny to Gilbert, Aug. 12, 1854 (Plaintiffs' Ex. 133).

Gilbert reported that approximately 4,000 Chippewa and a "great number" of traders and claims agents attended the 1854 treaty negotiations at La Pointe. Gilbert to Manypenny, Oct. 17, 1854 at 3 (Plaintiffs' Ex. 127). The Mille Lacs Band was not represented at the 1854 negotiations despite its use of a

portion of the ceded territory for hunting. Cleland Report at 133. The Mississippi bands refused to sell their remaining lands on any terms. Gilbert to Manypenny, Oct. 17, 1854 (Plaintiffs' Ex. 127) at 3. In fact, "much jealousy and ill feeling existed between the [Chippewa of the Mississippi] and the Lake Superior Indians and they could not even be prevailed upon to meet each other in council." *Id.*

Gilbert solved the problem by establishing a boundary line between the bands who resided near Lake Superior and those who lived along the Mississippi River. 1854 Treaty with the Chippewa, 10 Stat. 1109, art. 5 (Plaintiffs' Ex. 24). The Mississippi bands relinquished their claims to lands occupied by the Lake Superior bands east of the boundary line, and the Lake Superior band then ceded its title to these lands to the United States. *Id.*

The 1854 treaty established reservations for the L'Ance, Vieux De Sert, La Pointe, Lac du Flambeau, and Lac Courte Oreilles bands within the lands ceded in the 1837 and 1842 Treaties. The 1854 treaty also provided for a blacksmith and assistant at each reservation "in lieu of all the employees to which the Chippewas of Lake Superior may be entitled under previous existing treaties." 1854 Treaty. The treaty provided for annuity payments to include guns, rifles, traps, and ammunition. 1854 Treaty with the Chippewa, 10 Stat. 1109, art. 5 (Plaintiffs' Ex. 24). It barred the manufacture, sale or use of liquor throughout the ceded territory. *Id.* art. 7. The right to hunt and fish on the ceded territory was included:

> All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L'Anse, La Pointe, Grand Portage, and on the St. Louis River; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President.

1854 Treaty. According to the Chippewa, Gilbert assured them that their reservations "were not to confine us all together to live upon them—that we should have the privi-

lege of going out of it whenever we had a mind for hunting purposes." 1863 Treaty Council 30 (Plaintiffs' Ex. 254).

Gilbert explained that the Chippewa refused to execute any treaty that did not include these provisions:

[T]he points most strenuously insisted upon by [the Chippewa] were first the privilege of remaining in the country where they reside and next the appropriation of land for their future homes. Without yielding these points, it was idle for us to talk about a treaty. We therefore agreed to the selection of land for them in territory heretofore ceded.

Gilbert to Manypenny, Oct. 17, 1854 at 4 (Plaintiffs' Ex. 127).

On December 8, 1854, Manypenny forwarded the 1854 treaty to Secretary of the Interior Robert McCleland, recommending that the Senate delete two provisions that he considered seriously objectionable. Manypenny to McCleland, Dec. 8, 1854 (Plaintiffs' Ex. 136). Neither of these two provisions involved the retention of hunting, fishing, and gathering rights off reservation. On January 10, 1855, the 1854 treaty was ratified, and it was proclaimed on January 29, 1855. 1854 Treaty (Plaintiffs' Ex. 24).

On December 17, 1854, Congress passed the bill that was debated in the House of Representatives in May of 1854, providing retroactive authority for the 1854 treaty and the treaty later negotiated in February of 1855. Cong. Globe, 33rd Cong. 2d Sess. 53–54 (1854) (Plaintiffs' Ex. 137). It directed the President to include a provision in the new treaty to reserve lands for the Chippewa within the ceded territory, to pay annuities at villages in the ceded territory, to give the same privileges to mixed bloods living on ceded lands as to full blood Chippewa, and to extend federal and territorial law over the lands that would be ceded. *Id.* It also provided for the repeal of trade and intercourse laws, except those prohibiting the introduction and sale of alcohol to Indians. *Id.* It did not mention hunting, fishing, and gathering rights reserved in earlier treaties. *Id.*

After the authorization act passed, territorial delegate Henry Rice immediately wrote to Commissioner Manypenny to recommend that a new treaty be negotiated with the Mississippi, Pillager, and Lake Winnibigoshish band of Chippewa "at an early day." Rice to Manypenny, Dec. 17, 1854 (Plaintiffs' Ex. 138). Rice also recommended that the treaty be negotiated in Washington, D.C. and suggested that "Hole-in-the-day and six of [his chiefs], 'Flatmouth' (Chief of the Pillagers) and two of his Chiefs, and also two Chiefs from Lake Winnepek" be invited to the negotiations. *Id.* He explained:

Those Indians own all the lands drained by the waters of the Mississippi, a part of the lands on the Red river of the north (from its, source down) and also the lands situate[d] north of the Mississippi and to the British possessions. They can be brought on at a small cost if the treaty can be made before the end of the present session of Congress.

*Id.*

On January 4, 1855, Commissioner Manypenny directed Governor Gorman to tell Agent David Herriman to inform the Chippewa that the United States wanted to negotiate a new treaty "respecting their claim to lands in Minnesota." Manypenny to Gorman, Jan. 4, 1855 (Plaintiffs' Ex. 139). He instructed Herriman to bring the chiefs suggested by Rice, but "if the arrangements to bring them on or any of them would delay him so that he could not reach here by the time specified, he will come with the chiefs of the Mississippi bands only." *Id.* Manypenny did not mention the hunting, fishing and gathering privilege guaranteed under the 1837 treaty and did not instruct Herriman to take the Lake Superior bands, the Indians who occupied most of the 1837 ceded territory, with him to Washington.

Gorman told Herriman to take a Mille Lacs chief with him, but he instead took a St. Croix chief to represent the Mille Lacs Band at the treaty negotiations. Gorman to Manypenny, Jan. 31, 1855 (Plaintiffs' Ex. 140); Gorman to Manypenny, Feb. 1, 1855 (Plaintiffs' Ex. 135). A delegation from the Mille Lacs Band complained to Gorman, indicating that neither the St. Croix chief nor the Gull Lake leader, Hole-in-the-Day, could adequately represent them. *Id.* In fact, Gor-

man reported that the Mille Lacs chiefs told him that "if Hole-in-the-Day went to Washington and sold their land without them, that they would kill him the moment he returned home." Gorman to Manypenny, Feb. 1, 1855 (Plaintiffs' Ex. 135). Gorman sent the Mille Lacs delegation to Washington, D.C. with fur trader Clement Beaulieu, but there is no record of when they left St. Paul or arrived in Washington, D.C. *Id.;* Cleland Report at 139–40.

The 1855 treaty was negotiated from February 12–22, 1855, at the same time as the Rum River controversy. Hole-in-the-Day, who was chief of the Gull Lake Band for more than twenty years after the death of his father, Hole-in-the-Day the elder, served as the spokesman for the Mississippi bands.[14] Flatmouth was the principal spokesman for the Pillager and Lake Winnibigoshish bands. There is no record that the Mille Lacs Band spoke during the negotiations except for a single statement after the treaty was signed and the parties were discussing the division of the annuity payments.

The Chippewa communicated with Commissioner Manypenny through interpreters. Translation between Chippewa and English offered the same technical challenges during the 1855 treaty negotiations as it had during the 1837 treaty negotiations. Commissioner Manypenny observed that "one great impediment to a good understanding between the government and Indians arose from the fact that the latter cannot read or understand the contracts which they make." 1855 Treaty Journal at frame 320 (Plaintiffs' Ex. 142).[15] The 1855 Treaty Journal also indicates that one of the interpreters "suggested that, as his memory was defective, he would be glad if the speeches were broken into smaller fragments." *Id.* at frame 328. The interpreter later indicated that "it was difficult to make them understand [the number of acres in the tract which the Commissioner wanted

to purchase], owing to the large quantity of acres in the tract. By dividing numbers, however, he finally succeeded." *Id.* at frame 345. The author of the treaty journal also indicated that "Flatmouth made a remark, which the reporter did not understand." *Id.* at frame 334.

The Chippewa understood that the purpose of the treaty negotiations was the sale of land in northern Minnesota and repeated this understanding during the negotiations. On February 12, 1855, Manypenny told the Chippewa that "his object in sending for them was to buy from them a portion of their lands lying in the Mississippi country, which, when the Chippewas become cultivators of the soil like white men, they will not want, or be necessary to their support." 1855 Treaty Journal at frame 318. Hole-in-the-Day replied, "Your words strike us in this way. They are very short. 'I want to buy your land.' These words are very expressive— very curt."

On February 15, 1855, the Pillager chief Flatmouth said, "It appears to me that I understand what you want, and your views from the few words I have heard you speak. You want land." *Id.* at frame 327. Commissioner Manypenny responded, "He appears to understand the object of the interview. His people had more land than they wanted or could use, and stood in need of money; and I have more money than I need, but want more land." *Id.* at frame 328.

On February 17, 1855, Flatmouth again indicated that he understood that the purpose of the treaty was to purchase land. *Id.* at frame 342. The negotiations focused on the estimated number of acres and the price per acre. Tanner Report at 36–37.

During the negotiations, Manypenny frequently urged the Chippewa to live like whites, and Hole-in-the-Day made several speeches admiring the achievements in Washington, D.C. and indicating that the

14. Hole-in-the-Day was an interesting historical figure. Initially criticized for his style of leadership, he eventually became a well respected chief of his band. Driben I at 28. He was a "progressive" Chippewa who "lived in a finely furnished cabin near Crow Wing, drove an elaborate buggy and operated a productive farm and a ferry on the Mississippi river", but he "spoke only Ojib-

wa, was not a Christian, had six wives and was a renowned war chief who had killed many Dakota and at least one white man." Cleland Report at 144.

15. Frame refers to the microfilm frame numbers in the document.

Chippewa should become more like whites. For example, he said, "We want to dress like whites. We envy them their comfortable clothing. We want to adopt their habits and customs, and desire to have the means to accomplish it." On February 21, 1855, Hole-in-the-Day stated:

> The country is getting scarce of game, and we cannot get along without changing our habits. We have tried the old system, and found it wanting. We should therefore try a new one. Under the old system, we are sinking into ignorance worse than ever before. You can see the reason of this: Our people are getting to know the use of money ... I have studied [the treaty's] provisions. The Indians have given away all, and leave themselves no alternative but to work. They know, under the proposed arrangement, they must work or starve.

*Id.* at frame 385–86. He also said:

> Emigrants are coming among us. They won't be satisfied with the land now open for entry, and we cannot resist their encroachments, if we would. We should therefore prepare for a state of things which we cannot avert, and settle down like the whites.

*Id.* at frame 388. As Dr. Cleland commented, it is difficult to know how serious Hole-in-the-Day was about achieving these stated objectives:

> It had long become a tactic of the Chippewa as well as other Algonquian speaking Indians to play to their progress toward civilization in order to ingratiate themselves with Americans while at the same time they were struggling to maintain their own traditions. In this view chiefs often reassured their agents that they were now wearing white mans [sic] clothes, living in cabins, sending their children to school and working hard tending their gardens. They knew this was exactly what the government wanted to hear. Hole-in-the-Day was particularly accomplished at this strategy.

Cleland Report at 144; *see also*, Testimony of Helen Tanner and James McClurken.

The statements of the Chippewa during the treaty negotiations also indicate that they would continue to hunt, fish, and gather after the treaty was negotiated. *See, e.g.,* 1855 Treaty Journal at frs. 440, 445, and 446 (discussing whether the Chippewa could receive their annuity payments in early September when it would not interfere with their other activities). Not even Hole-in-the-Day would have considered abandoning the traditional way of life immediately because transition to an agricultural society would take a very long time.

During the negotiations the Chippewa mentioned that they would like to consult a third party. Commissioner Manypenny told them that he did not have an objection to them consulting a friend, but that "[i]t should be borne in mind, however, that the subject of their negotiations was a matter which concerned himself and his red brethren alone, and no extraneous influences should be brought to bear upon their deliberations." *Id.* at frame 343.

The Chippewa nevertheless sought advice from territorial delegate Henry Rice, a major fur trade merchant in the upper Mississippi region and a representative of the Rum River lumber interests. Cleland Report at 143. Rice spoke on February 20, 1855:

> Mr. Rice said they were the first Indians of the North who had expressed a desire to have such measures taken as to induce them to become white men. They were convinced that this was the only thing which can save or satisfy the tribe. They wish to have this means in their own hands like the whites. They desire to become white man, [sic] and felt satisfied that they would succeed in a few years, if at all. They wish in the first place, as far as that can be done here, to be placed upon the same footing as a white man, and have the balance with the Legislature of the Territory of Minnesota, as to the proper time to make them citizens and enable them to enjoy its benefits.

1855 Treaty Journal at frame 378 (Plaintiffs' Ex. 142). Less than one year after giving this advice to the Chippewa, Rice advocated the removal of the Mille Lacs Band from their reservation. Rice to Manypenny, Feb. 7, 1856 (Plaintiffs' Ex. 143).

The 1855 treaty ceded Chippewa lands and interests in the land. The first sentence of Article I of the 1855 treaty states:

The Mississippi, Pillager and Lake Winnibigoshish band of Chippewa Indians hereby cede, sell, and convey to the United States all their right, title and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, and included within the following boundaries....

10 Stat. 1165, art. 7 (Plaintiffs' Ex. 25). The area described is a 10 million acre tract of land located north and northwest of the 1837 ceded territory. The second sentence in Article I states:

And the same Indians do further fully and entirely relinquish and convey to the United States any and all right, title or interest, of whatsoever nature the same may be, which they may now have in, and to, any other lands in the Territory of Minnesota or elsewhere.

*Id.*

Article II of the 1855 treaty established the Mille Lacs reservation in the 1837 ceded territory. *Id.* The reservation was chosen by two representatives of the Mille Lacs Band, Shoboshkung and Petundunce. McClurken Report at 11.

Article III included $10,000 in goods for the Mississippi bands as part of the payment for the land. Commissioner Manypenny had indicated that the goods would include "guns, traps, & c." 1855 Treaty Journal at frame 351 (Plaintiffs' Ex. 142).

Article VII prohibits "the introduction, manufacture, use of, and traffic in, ardent spirits, wines, or other liquors ... within the entire boundaries of the country ceded to the United States." 10 Stat. 1165, art. 7 (Plaintiffs' Ex. 25).

In Article IX the Chippewa agreed to:

settle down in the peaceful pursuits of life, commence the cultivation of the soil, and appropriate their means to the erection of houses, opening farms, the education of their children, and such other objects of improvement and convenience, as are incident to well-regulated society.

*Id.* at art. IX. They also agreed to "respect and observe the laws of the United States, so far as the same are to them applicable," but no clause requiring the application of federal and territorial law in the area ceded was included as instructed in the authorizing act. Congressional Globe, Dec. 13, 1854 at 53–54 (Plaintiffs' Ex. 137).

The 1855 treaty did not mention hunting, fishing, and gathering rights at all, and the hunting, fishing, and gathering privilege guaranteed in the 1837 treaty was never mentioned during the 1855 treaty negotiations. Cleland Report at 184. The absence of discussion on this topic is not surprising because the parties at the 1855 treaty negotiations were the Mississippi and Pillager tribes. The Lake Superior Bands who occupied most of the 1837 ceded territory were not even invited to the 1855 treaty negotiations.

The phrase "relinquish and convey to the United States any and all right, title or interest" in and to lands does not have a Chippewa equivalent, and any attempt to translate the language literally would have had no meaning in Chippewa. Nichols Report at 9. The most likely translation of the phrase would have been the Chippewa equivalent of "relinquish and transfer to the United States the lands." Nichols Report at 11. This translation would not have conveyed any sense that the language included extinguishment of the hunting, fishing, and gathering privilege guaranteed under the 1837 treaty. *Id.*

The record shows that the government did not intend to extinguish the hunting, fishing, and gathering privilege guaranteed under the 1837 treaty. The 1855 treaty does not contain any reference to the usufructuary privilege reserved under the 1837 treaty. When the United States extinguished reserved rights of fishing in other treaties, it included explicit language ending those rights and providing monetary compensation. *See, e.g.,* 1855 Treaty with the Chippewa of Sault Ste. Marie, 11 Stat. 631 (the Chippewa "surrendered" the right of fishing at the falls of St. Mary's River "secured to them by the treaty of June 16, 1820" and the government agreed to appoint a commissioner to deter-

mine an appropriate monetary compensation) (Plaintiffs' Ex. 128); 1837 Treaty with the Sauk and Fox, 7 Stat. 543 (Plaintiffs' Ex. 153); 1846 Treaty with the Winnebago, 9 Stat. 878 (Plaintiffs' Ex. 154); 1865 Treaty with the Middle Oregon Tribes, 14 Stat. 751 (Plaintiffs' Ex. 155). If Manypenny had intended to revoke the hunting, fishing, and gathering privilege guaranteed under the 1837 treaty in the 1855 treaty, then he would have used similar provisions.

The purpose of the second sentence of Article I of the 1855 Treaty was not to extinguish the 1837 treaty privilege, but to extinguish any claims of the Chippewa to unceded lands north and west of the lands described in the first sentence. Cleland Report at 147–48.

Commissioner Manypenny's Feb. 23, 1855 letter to Secretary of the Interior McCleland supports this finding:

I have the honor to transmit, herewith, to be laid before the President, and, if deemed proper to be submitted to the Senate for its constitutional action, certain articles of agreement and convention, concluded on yesterday, with the Mississippi, Pillager, and Lake Winnibigoshish bands of Chippewa Indians, in Minnesota, by which they cede and convey to the United States all the lands owned and claimed by them in that Territory, and whatever right or interest they may have in other lands in common with other Indians there or elsewhere.

The quantity of land ceded, according to the boundaries defined in the first article, is estimated at from eleven millions to fourteen millions of acres, *besides which, those Indians (and especially the Pillager and Lake Winnibigoshish bands) have some right [or]* [16] *interest in a large extent of other lands in common with other Indians in Minnesota, and which right or interest, as above stated, is also ceded to the United States.*

Sen.Exec.Doc. No. 20, 33rd Cong., 2d Sess. (1855) (Plaintiffs' Ex. 145) (emphasis added). The eleven to fourteen million acres that Manypenny referred to is the land ceded in

the first sentence of Article I of the treaty. The language emphasized above refers to the second sentence in Article I which was added to ensure that the Chippewa did not have any remaining claims to lands located north and west of the territory ceded in the first sentence of Article I.

Three annual reports after 1848 had mentioned that these lands were claimed or owned by the Pillagers. 1848 ARCOIA 388 (Plaintiffs' Ex. 81); 1849 ARCOIA 1030–31 (Plaintiffs' Ex. 84); 1850 ARCOIA 89 (Plaintiffs' Ex. 100). For example, the 1850 Annual Report stated that:

the Pillagers claim, by title of conquest and actual possession, a large tract of country lying west of Red River. This matter, at the present time, is much agitated among these bands; and, as their head chiefs were not present to represent their interests at the convention of Prairie du Chien, the claim perhaps deserves consideration.

1850 ARCOIA 89 (Plaintiffs' Ex. 100).

Manypenny's statement that the land was especially claimed by the Pillagers indicates that he was not referring to the land ceded under the 1837 treaty because the Pillager chief Flatmouth stated at the 1837 treaty negotiations that his band did not own any of the lands that the United States wanted to purchase. 1837 Treaty Journal at 133 (Plaintiffs' Ex. 49).

The "in common with other Indians in Minnesota" phrase used by Manypenny also indicates that the second sentence in Article I did not refer to the hunting, fishing, and gathering privilege under the 1837 treaty. If Manypenny had been referring to the lands ceded in 1837, then he would have indicated that the lands were held in common with other Indians in Wisconsin and Minnesota because most of the signatories to the 1837 treaty resided in Wisconsin, not Minnesota.

Manypenny referred to other Indians in Minnesota because he was describing the unceded lands north and west of the land ceded in Article I of the 1855 treaty to which the Pillagers, Red Lake, and Bois Forte bands all asserted claims. The Red Lake band had not negotiated any treaties with the

---

**16.** The printed version says "of", but the original handwritten version says "or."

United States before 1855, and the claims of the Bois Forte band had been preserved in Article 12 of the 1854 Treaty. Manypenny drafted the broad language of "all right, title or interest, of whatsoever nature the same may be, which they may now have in, and to, any other lands" because he was not sure about the nature and scope of the claims made by the Chippewa to the remaining unceded lands in Minnesota.

Manypenny did not mention the 1837 treaty in his letter and mistakenly stated that none of the signatories to the 1855 treaty had previously been parties to any treaty with the United States, except the Pillager and Lake Winnibigoshish band who had executed an unimportant 1847 treaty. *Id.* at 2. If Manypenny had reviewed the 1837 treaty before the 1855 treaty negotiations, then he would have noticed that the Pillager Chief Flatmouth was listed as the first signatory to the 1837 treaty. 1837 treaty with the Chippewa, 7 Stat. 536, 537 (Plaintiffs' Ex. 1). Moreover, if Manypenny had intended to extinguish the hunting, fishing, and gathering privilege reserved under the 1837 treaty, then he certainly would have reviewed that treaty before the 1855 negotiations. He also would have instructed Agent Gilbert to revoke those rights in the 1854 treaty when he told Gilbert to cancel provisions in earlier treaties requiring smiths and farmers.

Most of the signatories to the 1837 treaty attended the 1854 treaty negotiations rather than those for the 1855 treaty. If the government had wanted to revoke the usufructuary 1837 privilege on more than a small portion of the 1837 ceded territory, it would have included a revocation provision in the 1854 treaty.

The preservation of hunting, fishing, and gathering rights reserved under the 1837 treaty was not inconsistent with Manypenny's reservation policy. Manypenny negotiated more than 40 treaties as Commissioner of Indian Affairs. Many of the treaties expressly reserved hunting, fishing, and gathering rights on the ceded lands. 1854 treaty of La Pointe, 10 Stat. 1105 (Plaintiffs' Ex. 24); 1854 treaty with the Nisqually, Puyallup, etc., 10 Stat. 1132 (1854) (Plaintiffs' Ex. 156); 1855 treaty with the Dwamish, Suquamish, etc., 12 Stat. 927 (Plaintiffs' Ex. 157); 1855 treaty with the S'Klallam, 12 Stat. 933 (Plaintiffs' Ex. 158). Only one of the Manypenny treaties expressly revoked hunting, fishing, or gathering rights, and that followed destruction of a fishery by the United States government. Treaty with the Chippewa of Sault Ste. Marie, 11 Stat. 631 (1855) (Plaintiffs' Ex. 128). If Manypenny had wanted to extinguish the 1837 privilege, then he would have used similar language.

Moreover, the 1855 treaty terms and negotiations indicate that Manypenny expected the Chippewa to continue to hunt, fish and gather. *See, e.g.,* 1855 Treaty Journal at frame 340 (present of $10,000 in goods would include guns and traps); 1855 treaty (Plaintiffs' Ex. 25) (providing five years worth of gunpowder, shot, lead, and gilling twine to the Pillager and Lake Winnibigoshish bands and banning the manufacture, introduction, and sale of alcohol throughout the ceded territory to prevent the Chippewa from exposure to alcohol when hunting, fishing, and gathering off-reservation) (Plaintiffs' Ex. 142); 1855 Treaty Journal at frame 440, 441, 443, 445 (discussing timing of annuity payments to avoid interference with hunting, fishing, and gathering and encouraging the sale of furs) (Plaintiffs' Ex. 142). The court finds that neither the Chippewa nor the United States intended to extinguish the 1837 privilege in the 1855 treaty.

Dr. Driben's testimony that the Chippewa intended to relinquish the right to hunt, fish, and gather in the 1855 treaty as part of an effort to preserve their culture by encouraging their people to give up the chase was not persuasive. Dr. Driben is an anthropologist specializing in ethnohistorical research of the Chippewa culture, but he is not expert in the area of the government's Indian policies, including those relating to removal and reservations.

Dr. Driben testified that in 1855 the Chippewa culture was being distorted because of stress caused by war with the Dakota, decline of the fur trade, decreasing wild rice crop, and threat of removal. He testified that the cultural stress was enhanced because the war chiefs and peace chiefs could not agree how best to respond, and depen-

dence on alcohol was increasing. According to Dr. Driben, the Chippewa decided to abandon the chase and adopt a new economic regime similar to the Euro–American economy. He argues that Hole-in-the-Day was the leader of what he terms a revitalization effort [17] and that Hole-in-the-Day intended not to reserve hunting, fishing, and gathering rights in the 1855 treaty in order to encourage his people to change their economy.

The court finds that the record does not support the foundation offered by Dr. Driben for his theory.[18] The number of confrontations in the sporadic war with the Dakota had actually decreased significantly by the 1850's. Cleland Report at 33. Although the fur trade had declined, the Mille Lacs Band still had significant opportunities to market furs and other natural resources, and the wild rice crop was large in 1854. Spates to Dear Brother, Aug. 7, 1854 (Plaintiffs' Ex. 240). The possibility of removal was a stress for all of the Chippewa, but it was a far less significant stress for groups like the Mille Lacs Band which had never been instructed to remove. Dr. Driben himself indicated that the Chippewa never intended to give up hunting, fishing, and gathering entirely and only wanted to supplement the chase with additional economic activities. If this were the mind set of the Chippewa in 1855, it would have made little sense to give up the hunting, fishing, and gathering privilege guaranteed under the 1837 treaty.

Dr. Driben erroneously assumed that Hole-in-the-Day represented the Mille Lacs Band during the 1855 treaty negotiations. There had been an ongoing disagreement between the Mille Lacs Band and Hole-in-the-Day which began during the 1847 treaty negotiations. Representatives of the Mille Lacs Band told Governor Gorman that they would kill Hole-in-the-Day if he sold their land.

Finally, at the same time the 1855 treaty was negotiated, the Mille Lacs Band was fighting to protect its wild rice crops. This indicates that the Band continued to rely on gathering to survive. The court finds that the Chippewa did not intend to give up their 1837 treaty privilege and they did not understand the 1855 treaty to have that effect.

## VI.

The actions of the Mille Lacs Band and the United States after the 1855 treaty show that both parties believed that the 1837 privilege continued to exist. After the 1855 treaty was signed, the Mille Lacs Band continued to follow its traditional pattern of hunting, fishing, and gathering throughout the 1837 ceded territory. McClurken Report at 21–23; Cleland Report at 164–74; Whiting to Manypenny, Feb. 20, 1856 (Plaintiffs' Ex. 249); Herriman to Huebschmann, July 2, 1856 (Plaintiffs' Ex. 250); Walker to Thompson, Sept. 25, 1861 (Plaintiffs' Ex. 253); Walker to Thompson, March 22, 1862 (Plaintiffs' Ex. 146); Morrill to Thompson, Jan. 5, 1864 (Plaintiffs' Ex. 147); 1864 ARCOIA 560 (Plaintiffs' Ex. 148); Bassett to Whipple, Dec. 12, 1867 (Plaintiffs' Ex. 262); Smith to Parker, March 31, 1871 (Plaintiffs' Ex. 266); 1875 ARCOIA 54–55 (Plaintiffs' Ex. 268); Chadborne to Folsom, April 10, 1876 (Plaintiffs' Ex. 269); Stowe to Smith, Sept. 8, 1876 (Plaintiffs' Ex. 270); Chapman Report, Aug. 25, 1882 (Plaintiffs' Ex. 149); Wright to Price, June 27, 1883 (Plaintiffs' Ex. 273); Nelson to Teller, July 21, 1883 (Plaintiffs' Ex. 274); Nelson to Commissioner of Indian Affairs, July 21, 1883 (Plaintiffs' Ex. 281); Baldwin to Commissioner of Indian Affairs, July 24, 1895 (Plaintiffs' Ex. 282); Wahweyeacuming et al. to Commissioner of Indian Affairs, July 6, 1897 (Plaintiffs' Ex. 285); Peel to Ayer, Nov. 7, 1919 (Plaintiffs' Ex. 289).

United States officials recognized that the Mille Lacs Band depended on natural resources for its survival and encouraged hunt-

---

17. A revitalization movement is an attempt to save a culture by transforming its core principles in response to severe cultural stress. Driben Revitalization Report at 25–26.

18. For example, Dr. Driben relied only selectively on the dissertation of Rebecca Kugel, "To Go About On the Earth": An Ethnohistory of the Minnesota Ojibwe; 1830–1900. Although he quoted extensively from it, other portions conflict with his testimony. See, e.g., Plaintiffs' Ex. 312 at 259, 261.

ing, fishing, and gathering by providing supplies for these activities and by agreeing to make annuity payments at times that would not interfere with them. 1855 Treaty Journal (Plaintiffs' Ex. 142) at frame 440–46; Walker to Thompson, Sept. 25, 1861 (Plaintiffs' Ex. 253); 1864 ARCOIA 560–61 (Plaintiffs' Ex. 148); Knickerbocker to Commissioner of Indian Affairs, Dec. 14, 1867 (Plaintiffs' Ex. 263); Stowe to Smith, Sept. 8, 1876 (Plaintiffs' Ex. 270); 1877 Annuity Estimate (Plaintiffs' Ex. 271).

On December 24, 1855, four Chippewa chiefs, including one from Mille Lacs, sent a petition to the President complaining about corruption of the Indian agency at Crow Wing and the mishandling of annuity payments. Mississippi Chippewa to President, Dec. 24, 1855 (State's Ex. 41). In the petition they indicated that they wanted to "follow the ways of civilized life", but they explained the goal could not be attained without capital. *Id.*

In 1862 Hole-in-the-Day led several bands of Chippewa in an uprising to protest government mismanagement and corruption. Hole-in-the-Day also threatened to join a contemporaneous Dakota uprising in which 800 settlers had died. The Mille Lacs Band refused to join Hole-in-the-Day, indicating that the rift between them created by the 1847 treaty negotiations and exacerbated by the 1855 treaty negotiations had not closed. The Mille Lacs Band in fact sent warriors to help the United States troops at Fort Ripley where settlers had fled from Hole-in-the-Day's group. It also persuaded other Chippewa bands not to join in the uprising. Cleland Report at 155–56.

After the uprising, settlers began to demand that both the Chippewa and Dakota be removed from the state. Cleland Report at 157–58. In 1862, the United States suggested removing the Gull Lake, Rabbit Lake, Rice Lake, Mille Lacs, Pokegama, and Sandy Lake Chippewa north to a reservation near Leech and Winnibigoshish lakes, but the Chippewa objected and proposed that their new home be a larger reservation at Mille Lacs. Cleland at 158. The government opposed this idea, and no agreement was reached.

In early 1863, the United States summoned a delegation of Chippewa to Washington D.C. to discuss removal again. The negotiations resulted in a treaty after Henry Rice, now Senator Rice, held private discussions with the Chippewa. Rice considered himself the exclusive author of the treaty and actually executed it as "Henry M. Rice, of Minnesota, for and on behalf of the Chippewas of the Mississippi and the Pillager and Lake Winnibigoshish Band of Chippewa Indians in Minnesota." Rice to Whipple, March 18, 1863 (Plaintiffs' Ex. 256); 12 Stat. 1249 (Plaintiffs' Ex. 255).

In Article I of the 1863 Treaty the Chippewa ceded the "reservations known as Gull Lake, Mille Lac, Sandy Lake, Rabbit Lake, Pokagomin Lake, and Rice Lake" to the United States. Article II established a new reservation in northwestern Minnesota later known as the White Earth Reservation. Article XII of the treaty promises that the Mille Lacs Band will not have to remove:

owing to the heretofore good conduct of the Mille Lac Indians, they shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites.

1863 Treaty with the Chippewa, 12 Stat. 1249 (Plaintiffs' Ex. 255).

In 1863 Hole-in-the-Day wrote to President Lincoln explaining that the new reservation did not have adequate fish, game, rice, and sugar which the Chippewa still relied upon to survive. McClurken Report at 42–43. In 1864 Hole-in-the-Day and a Sandy Lake chief renegotiated the 1863 treaty to provide a larger reservation. 13 Stat. 693 (Plaintiffs' Ex. 257).

From 1865 to 1889, speculators filed claims on lands on the Mille Lacs Reservation and illegally harvested most of the pine timber on the reservation, and the Mille Lacs Band tried to preserve the reservation and its right to live there. McClurken Report at 46–118. In 1877, Mille Lacs Chief Shaboshkung told the Commissioner of Indian Affairs:

We are not willing to go [to White Earth]. We would like to remain at Mille Lac. We want to ask our Great Father to permit us

to remain where we are and to permit us to take lands under the homestead Law. We are willing to adopt the Christian Religion also the habits and costums [sic] of the whites and to be under the Laws of the State of Minnesota. We want assistance from our Great Father the President of the United States to furnish means to have a school for our children means to cultivate the soil such as Cattle, Ploughs and other farming utensils ... We are perfectly satisfied to live where we are. We have some good land for farming purposes. We also have fish in the lakes, Wild Rice and game in abundance—And we make plenty of sugar. We have lived so far without the assistance of our Great Father, and if we did not intend to Lead a different life we would not ask any assistance now.

*Id.* at 84.

On January 14, 1889, Congress passed the Nelson Act. It instructed the President to:

negotiate with all the different bands or tribes of Chippewa Indians in the State of Minnesota for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake Reservation, and to all and so much of these two reservations as in the judgment of said commissioners is not required to make and fill the allotments required by this and existing acts, and shall not have been reserved by the Commissioners for said purposes.

25 Stat. 642 (Plaintiffs' Ex. 276). Section 3 provided an exception to removal to White Earth for those Indians who purchased allotments:

that any Indians residing on any of said reservations may, in his discretion, take his allotment in severalty under this Act on the reservation where he live ... instead of being removed to and taking such allotment on the White Earth Reservation.

*Id.* § 3 (Plaintiffs' Ex. 76).

The President appointed Henry Rice as chair of a three commissioner panel created by the Act. H.R.Exec. Doc. 247, 51st Cong., 1st Sess. (1890) (Plaintiffs' Ex. 279). The panel negotiated an agreement with the Mille Lacs Band in October of 1889. During the negotiations Rice told the Band that the agreement would not affect rights under earlier treaties and would actually "leave[ ] you in a stronger position than before." *Id.* at 169.

During the negotiations a chief asked Rice: "Another thing—about the wild animals. If an Indian wishes to go outside the reservation to hunt deer, will he be allowed to do so in the hunting season?" Rice replied that:

in regard to hunting deer, that is a matter for the Legislature of the State to determine. You can hunt deer in any event, whenever you find them during the season set apart for hunting; and wherever the white man may hunt your young men will have the same right to do so. If you commit any depredation upon any man's property you will be punished for it.

*Id.* at 179. The negotiations focused on removal, and the conversation therefore moved on to other topics. There is no evidence that the Chippewa then understood the statement to require that they hunt only in compliance with state regulations. Rice's comments are also not persuasive evidence that the Band's privilege under the 1837 treaty had been abrogated by the 1850 executive order or the 1855 treaty because he made similar comments to the Grand Portage Band which clearly still retained hunting, fishing, and gathering rights under the 1854 Treaty. *Id.* at 176–79.

The record indicates that the Mille Lacs Band could not have survived if its members had not been allowed to hunt and fish off-reservation.

The State enacted statutes relating to seasons for hunting deer, elk, and game birds from the time of statehood in 1858. 1858 Minn.Laws 40, Ch. XIX (prohibiting anyone within the State from hunting of deer and elk from February 1 until September 1 and hunting grouse, prairie-chicken, partridge and quail from February 15 until July 15); 1858 Minn.Laws 103, ch. XLIV (applying the laws of the State to Indians when they are off-reservation and requiring passes for Indians to leave their reservations), 1858 Minn. Laws 105, ch. XLV (prohibiting use of sein,

net, basket, or trap to catch trout) (State's Ex. 44).

The State did not attempt to enforce these laws systematically for at least 24 years. The Game and Fish Commission of Minnesota observed in its first annual report published in 1892:

Notwithstanding all the obstructions and hindrances to the full enforcement of the law, the commission cannot help but feel as if they had made great and permanent headway, considering this year's effort is only the initiatory, and really the first attempt to systematically regulate and control the killing of game and prevent its entire extermination.

First Annual Report of the Game and Fish Commission of Minnesota, 1892 (State's Ex. 61). Isolated incidents of game law enforcement were reported in local newspapers. *See* The Little Falls Transcript, March 9, 1894, (Counties Ex. 26) (Game Warden orders Indians and non-Indians to stop killing game and fish for sale during off season); Weekly Transcript, August 3, 1894, (Counties' Ex. 9) (Leech Lake Indian sentenced to 60 days in jail for killing deer out of season); Weekly Transcript, August 10, 1894 (Counties' Ex. 10) (Game Warden stated that "a large number" were violating the game law in shooting chickens out of time).

On December 13, 1898, Congressman Joel Heatwole wrote to the Commissioner of Indian Affairs to complain about Minnesota Indians killing game off-reservation in violation of game laws. On December 16, 1898, the Commissioner responded that he had sent a letter to the Indian Agents at the White Earth and La Pointe Agencies instructing them to teach the Indians about the State's game laws and that he expected this action would solve the problem. COIA to Heatwole, Dec. 16, 1898.

During the early twentieth century, the Chippewa continued to hunt, fish, and gather throughout the 1837 ceded territory. Ayer to Dear Sir, Nov. 7, 1919 (Plaintiffs' Ex. 289). A commercial fishery was also opened on Lake Mille Lacs by some Chippewa. *Id.;* Dist. Agr. Agt. to Wilson, May 22, 1919 (Plaintiffs' Ex. 288).

In 1926 Commissioner of Indian Affairs Burke responded to a letter from three individual Chippewa who had inquired about their hunting and fishing rights under the 1837 treaty. He responded that the 1855 treaty had modified the 1837 treaty and explained "if the land you were hunting is within any of the land ceded by said Indians, it would be necessary for you to comply with state law in view of the modified provisions of the treaty." Burke to Ayeashsung, Barney, and House, May, 5, 1926 (State's Ex. 75). The letter did not include any further analysis of the 1855 treaty. *Id.*

On April 30, 1934, Commissioner of Indian Affairs Collier informed a Mille Lacs Chippewa who had been arrested for taking a deer off the reservation of season that his arrest was valid. Collier to Reynolds, April 30, 1934 (State's Ex. 80).

On March 1, 1938, President Franklin Roosevelt wrote the Bad River Band of Chippewa in Wisconsin that the hunting, fishing, and gathering privilege guaranteed by the 1837 and 1842 Treaties had been revoked by the 1850 executive order. President Roosevelt to Whitebird, March 1, 1938 (State's Ex. 6, n. 89).

These statements from the turn of the century and later about the effects of the nineteenth century documents are consistent with the position advanced by defendants in this action, but there is no evidence that the authors had considered all of the background relevant to treaty interpretation. If they had examined the historical record, they would have discovered that people who lived closer in time to the negotiation of the 1855 treaty and the issuance of the 1850 executive order did not suggest that either of these documents extinguished the 1837 privilege even though there were always people seeking prohibition of off-reservation hunting, fishing, and gathering.

Based on a careful examination of the historical record established at trial, the court finds that the practical construction of the 1855 treaty by the parties to it indicates that the parties intended that the 1837 privilege continue to exist.

## VII.

The legal issues presented in Phase I require interpretation of Indian treaties, and special rules of construction apply.

The first rule is that Indian treaties must be construed as the Indians understood them. *Jones v. Meehan,* 175 U.S. 1, 4–5, 20 S.Ct. 1, 2, 44 L.Ed. 49 (1899). This rule of construction was developed because the Indians did not know English, they had to depend on government interpreters for their understanding of the negotiations and treaties, and they were not familiar with legal terms and phrases. *Jones v. Meehan,* 175 U.S. 1, 4–5, 20 S.Ct. 1, 2, 44 L.Ed. 49 (1899); *Washington v. Washington Commercial Passenger Fishing Vessel,* 443 U.S. 658, 675–76, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979). It also reflects the assumption that the United States was bargaining from a stronger position than the Indians. *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 90, 30 L.Ed. 306 (1886). A "treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Passenger Fishing Vessel,* 443 U.S. at 675–76, 99 S.Ct. at 3069.

■ A second rule of construction requires any ambiguous term in a treaty to be resolved in favor of the Indians, particularly if the language could either be interpreted in favor of the Indians or the United States:

> On account of their relations to the Government, it cannot be supposed that the Indians were alert to exclude by formal words every inference which might mitigate against or defeat the declared purpose of themselves and the Government even if it could be supposed that they had the intelligence to foresee the "double sense" which might some time be urged against them.

*Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908). Together these canons of construction require a liberal interpretation in favor of the Indians. *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 350 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983).

■ Although these canons of construction require treaties to be interpreted liberally in favor of the Indians, courts may not ignore the reasonably interpreted language of a treaty:

> But if the words used in the treaty of 1866, reasonably interpreted, import beyond question to the United States free from any trust, then the court cannot amend the treaty or refuse to carry out the intent of the parties, as gathered from the words used, merely because one party to it held the relation of an inferior and was politically dependent upon the other, or because in the judgment of the court the Indians may have been overreached.

*United States v. Choctaw,* 179 U.S. 494, 535, 21 S.Ct. 149, 165, 45 L.Ed. 291 (1900).

The history of the treaty, the negotiations, and the practical construction of the treaty by the parties may all be considered when interpreting an Indian treaty. *Lac Courte Oreilles Band* at 351; *see also Passenger Fishing Vessel,* 443 U.S. at 675, 99 S.Ct. at 3069.

■ The State, Counties, and Landowners argue that the privilege reserved in the 1837 treaty was temporary and later extinguished. They assert that the language "at the pleasure of the President" gave the President unfettered discretion to revoke the privilege which was done by the 1850 executive order:

> The privileges granted temporarily to the Chippewa Indians of the Mississippi, by the Fifth Article of the Treaty made with them on the 29th of July 1837 "of hunting, fishing and gathering the wild rice upon the lands, the rivers, and the lakes included in the territory ceded" by that treaty to the United States ... are hereby revoked; and all of the said Indians remaining on the lands ceded aforesaid, are required to remove to their unceded lands.

These arguments were considered and rejected in *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 358–63 (7th Cir.1983). The defendants argue against application of *Lac Courte Oreilles Band v. Voigt* on the ground that it was wrongly decided, but it is signifi-

cant precedent for key issues in the case. There the Seventh Circuit was called upon to decide the nature of the same usufructuary rights reserved to the Chippewa in the 1837 treaty and whether they were extinguished by the 1850 executive order. The Seventh Circuit concluded after a thorough analysis that the 1837 treaty authorized termination of the usufructuary privilege only if the Indians were to "misbehave" by harassing white settlers. The 1850 executive order was not an effective revocation because it was not based on Indian misbehavior:

> the qualifying language in the [1837 treaty] did not confer the unlimited discretion on the Executive that it appears to; rather, it required that the Indians be denied their usufructuary privileges only if the Indians were instrumental in causing disturbances with white settlers.

*Lac Courte Oreilles Band v. Voigt* at 357. The Seventh Circuit concluded that the 1850 executive order exceeded the scope of the 1837 treaty and was invalid. *Id.* Not only is *Lac Courte Oreilles* convincing authority, but study of the much more complete record available in this case after a lengthy trial leads to the same conclusions.[19]

### A.

■ The defendants argue that President Taylor's same order to remove the Indians and to extinguish their privilege was intended to open the lands for settlement and had express and implied authorization from Congress. They rely on the 1830 Removal Act, 4 Stat. 411, the 1837 Appropriations Act, 5 Stat. 158 (1837), and statements made by executive branch officials from 1829 until 1848.

The Band responds that the 1850 executive order exceeded the President's authority and violated applicable laws because the Chippewa bands had not consented to remove before it was issued even though the 1830 Removal Act required their consent prior to removal. It contends that the 1837 appropriations act did not provide authorization for the order and that the letter that the Commissioner of Indian Affairs sent to 1837 treaty negotiator Dodge does not mention removal and it was not discussed during the negotiations.

"The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952). The Court has recognized as useful the three categories developed by Justice Jackson to analyze congressional authorization in his concurring opinion in *Youngstown Sheet & Tube. Dames & Moore v. Regan,* 453 U.S. 654, 668–69, 101 S.Ct. 2972, 2980–81, 69 L.Ed.2d 918 (1981).

When the President acts pursuant to an express or implied authorization of Congress, the executive action "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube,* 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J. concurring). If the President acts without congressional authorization, then he may enter "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* In that case, the court must consider any information that might illuminate congressional views on the subject including "congressional inertia, indifference or quiescence." *Id.* If the President's action is opposed to congressional will, his action can be sustained "only by disabling the Congress from acting upon the subject." *Id.* at 637–38, 72 S.Ct. at 871.

■ The Constitution does not provide the President with the power to remove Indian tribes or to abrogate rights guaranteed under treaties. Congress has plenary authority over Indian affairs. *Lac Courte Oreilles Band,* 700 F.2d at 361; *see also, Warren Trading Post v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). This authority is based on the treaty power and the Indian commerce clause.

---

19. The *Lac Courte Oreilles* case went to the Seventh Circuit from summary judgment decisions in the district court. *United States v. Bouchard; United States v. Ruby; Lac Courte Oreilles Band v. Voigt,* 464 F.Supp. 1316 (W.D.Wis.1978).

U.S. Const. art. II, § 2, cl. 2; and art. I, § 8, cl. 3. Only Congress can abrogate an Indian treaty right by expressing that intention clearly and plainly. *See, e.g., United States v. Dion,* 476 U.S. 734, 738, 106 S.Ct. 2216, 2219, 90 L.Ed.2d 767 (1986); *Lone Wolf v. Hitchcock,* 187 U.S. 553, 567, 23 S.Ct. 216, 222, 47 L.Ed. 299 (1903).

Congress did not give President Taylor the authority to remove the Chippewa without their consent. In fact, it expressed an intent that Indians should not be removed without their consent when it authorized the President to convey lands west of the Mississippi River to "such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there." 1830 Removal Act § 2, 4 Stat. 411, 411–12 (Plaintiffs' Ex. 43).

■ General appropriations acts have the limited and specific purpose of providing funds for authorized programs, and Congress is entitled to the presumption that the appropriated funds will be used only for lawful purposes. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). An appropriations act should therefore not be used to imply repeal of an earlier statute. *Id.*

The 1837 appropriations act did not mention or modify the requirement that Indians consent to removal. It merely allocated money for treaty negotiations for cessions of land and removal. 1837 Appropriations Act, 5 Stat. 158–63 (Plaintiffs' Ex. 44).

■ Members of the executive branch cannot repeal a statute. *Meehan v. Macy,* 392 F.2d 822, 838–39 n. 43 (D.C.Cir.1968). Only Congress could repeal the statutory consent requirement for removal. Even if statements by executive branch officials could provide legal authority for President Taylor's action, however, the statements identified by the defendants do not prove that the executive intended to repeal the consent requirement. In fact, President Jackson, who was described at trial as a vigorous proponent of

removal at any cost, advocated removal as quickly as possible, but imposed the limitation "as soon as their consent can be obtained." *The State of the Union Messages of the Presidents, 1790–1966* (Fred L. Israel, ed. 1966), 438, vol. I.

The 1837 treaty does not provide any authority for the 1850 executive order. When the government negotiated removal treaties, it included provisions discussed in the 1830 Removal Act, including payments for improvements on abandoned lands, assistance in removal, and promises to provide subsistence for one year after removal. 1830 Removal Act §§ 4–5, 4 Stat. at 411 (Plaintiffs' Ex. 43). Such treaties had detailed arrangements for removal. *See infra* at p. 793 n. 6. The 1837 treaty does not include any similar provisions, and there is absolutely no language in the treaty indicating that the Chippewa agreed to remove.

The evidence at trial demonstrated that neither of the parties to the 1837 treaty intended by it that the Chippewa would consent to removal. Removal is not mentioned in the instructions that Commissioner Dodge received, in the treaty journal, or in Dodge's report to the Commissioner of Indian Affairs. If removal had been a subject of the treaty negotiations or included in the final treaty, it would have been mentioned in at least one of these documents.

Evidence that the Chippewa expressed concern about removal after they signed the 1837 treaty does not indicate that they consented to removal in that treaty. Given the continuous government discussion of removal of the Chippewa, the Chippewa would have been foolish not to worry about removal even if they had not yet consented to it.

Since the Chippewa living in the 1837 ceded territory had not consented to removal as required by Congress, President Taylor acted outside of his authority when he issued the 1850 executive order requiring their removal from that area.[20]

---

**20.** The State notes, that if Congress had passed a statute identical to the order, it would have been a lawful exercise of authority even if contrary to the intent of the Chippewa in the 1837 treaty. It contends that the 1850 Executive Order was law-

ful therefore because it was consistent with Congressional intent that Indians be removed.

Whether Congress could have passed a bill containing the 1850 Executive Order language is irrelevant because it did not. Under the separa-

### B.

The defendants argue that even if the portion of the 1850 executive order requiring removal were unlawful, it should be severed from the portion revoking the hunting, fishing, and gathering privilege. They contend that President Taylor had authority to issue this portion of the order. The Landowners argue that revocation of the hunting, fishing, and gathering privilege was necessary to survey lands in the 1837 territory and to clear land title for non-Indian settlement.

The Band responds that the portion of the executive order revoking the hunting, fishing, and gathering privilege in the 1837 ceded territory may not be severed from the unlawful directive to remove because they were intended to operate together. It asserts that the only reason the revocation clause was included was to facilitate removal. It contends that there is no evidence that the usufructuary rights were revoked to clear title and make way for non-Indian settlement of the ceded territory. It notes that lands were surveyed in the 1837 ceded territory before the executive order was issued. It also points to Governor Gorman's February 16, 1855 letter describing the Rum River controversy as evidence that lands could be surveyed and sold even when usufructuary rights still existed.

The standard used to determine whether to sever part of an unconstitutional statute passed by Congress is also used for executive orders. *Matter of Reyes,* 910 F.2d 611, 613 (9th Cir.1990). Under this test, "[u]nless it is evident that the [executive] would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Ref. Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932). *See also INS v. Chadha,* 462 U.S. 919, 931–32, 103 S.Ct. 2764, 2773–74, 77 L.Ed.2d 317 (1983); *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976); *United States v. Jack-*

son, 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968).

The evidence did not show that the President would have issued an executive order separately extinguishing the hunting, fishing, and gathering privilege if he had known that removal could not be validly required. The evidence shows that the only reason that the 1850 executive order included language extinguishing the hunting, fishing, and gathering privilege was to facilitate removal of the Chippewa to benefit the Minnesota economy. Revocation of the privilege in Minnesota without removal would not have aided the economy because it would have halted useful trade in furs and other natural resources by the Chippewa without other benefit in return.

When Commissioner of Indian Affairs Brown forwarded the 1850 executive order to Ramsey, he noted that "[t]he policy of the measure here referred to is announced in my late annual report, and its execution during the present year has been determined on." Brown to Ramsey, 2–6–1850 at 1 (Plaintiffs' Ex. 88). That annual report discusses removal, not revocation of the hunting, fishing, and gathering privilege.

At trial, Mr. Newell relied on a March 28, 1850 letter from Reverend Hall to Reverend Treat to support his position that the executive order had two independent purposes:

> [Watrous] has just received an order from the president of the U. States revoking the privileges granted by their treaties of remaining temporarily on their ceded lands, and requiring them to remove early next summer. The question is therefore settled, that an attempt is to be made for their immediate removal.

Hall to Treat, 3–28–1850 (State's Ex. 3 n. 86). The letter actually suggests that the sole purpose of the 1850 executive order was to remove the Chippewa. Even if the letter had some other meaning, a letter from a missionary is itself not evidence of government policy.

tion of powers Congress may take actions that the President could not take unilaterally. In this case, Congress required the President to obtain the consent of Indians before they were removed, and President Taylor issued the 1850 order in contravention of this consent requirement. The order is therefore invalid regardless of whether Congress could have taken the same action.

Mr. Newell argued that the 1850 executive order was signed not only to remove the Chippewa, but also to clear title and make way for non-Indian settlement of the ceded territory. No government report or letter indicates that the executive branch considered this objective when it issued the 1850 executive order. Moreover, lands were surveyed in the 1837 ceded territory before 1850. Squires Report at 24–26 and Fig. 11. Lands were also surveyed in the territory ceded in the 1854 Treaty, despite the continued rights of Chippewa to hunt and fish on that land. Squires Report at 26. There was also no evidence that the privilege was a cloud on title at this time.

The essential purpose of the 1850 executive order was to remove the Chippewa from the 1837 and 1842 ceded territories. Revocation of hunting, fishing, and gathering rights guaranteed under the 1837 treaty was included in the order only to encourage removal. The President would not have issued an executive order merely to extinguish the usufructuary rights guaranteed under the 1837 treaty. The 1850 executive order was not authorized by Congress or the 1837 treaty and was therefore unlawful.

### C.

█ The Band argues that even if the 1850 executive order were severable, the clause revoking usufructuary rights was itself invalid because it violated the 1837 treaty. It contends that the evidence demonstrated that the 1837 treaty did not give the President unfettered discretion to revoke the usufructuary rights. Unlimited discretion would be inconsistent with the duty of good faith that Dodge promised the Chippewa they would receive from their Great Father. It contends that the Chippewa intended and understood that their usufructuary rights would be protected by the President as long as they remained at peace with the United States. The 1850 order violated the 1837 treaty because it was issued to advance political and economic goals of some Minnesotans.

The State responds that the language of the 1837 treaty guaranteed the usufructuary rights only "at the pleasure of the President." It contends that the only plausible meaning of this phrase is that the President had sole discretion to revoke the usufructuary rights and that this language should be enforced regardless of the understanding of the Chippewa.

The Landowners argue that the good faith requirement of the Northwest Ordinance applies only to land and property owned by Indians, not temporary usufructuary privileges. Even if the President's discretion was limited by a duty of good faith, the Landowners contend that the appropriate standard would be good faith within the sense understood in 1850.

█ It is well-settled that the relationship between the United States and Indian tribes is similar to the relationship between a guardian and a ward. Government officials must therefore act as fiduciaries when dealing with tribes and must consider and protect the interests of their Indian wards. *Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17–18, 8 L.Ed. 25 (1831); *St. Paul Intertribal Hous. Bd. v. Reynolds*, 564 F.Supp. 1408, 1411 (D.Minn.1983).

Good faith was also required by the Northwest Ordinance:

the utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights, and liberty, they shall never be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall, from time to time, be made, for preventing wrongs being done to them and for preserving peace and friendship with them.

1 Stat. 51, art. 3 (1787) (Plaintiffs' Ex. 42).

█ Even the performance of contracts between private parties includes a good faith requirement. That is true also where one party reserves sole discretion. *Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C.Cir.1984) (employer who reserved sole discretion to change its quota plan must still exercise good faith when changing it). If private parties to a contract must perform their discretionary

powers in good faith, then surely the President owes a special obligation to his Indian wards.

Contrary to the assertions of defendants, the 1837 treaty did not give the President unfettered discretion to revoke the guaranteed usufructuary rights. That discretion was restricted so long as the Indians behaved well and peacefully, for the treaty:

> authorized termination of the Chippewas' right to exercise their usufructuary privilege on ceded land *only* if the Indians misbehaved by harassing white settlers. The pivotal question relevant to the validity of the 1850 Removal Order is therefore whether the Indians had misbehaved.

*Lac Courte Oreilles Band v. Voigt* at 361 (emphasis in original). During the 1837 treaty negotiations, Dodge repeatedly assured the Chippewa that their Great Father would treat them justly. The Chippewa repeatedly told Dodge that they needed to hunt, fish, and gather on the lands to survive. The primary purpose of the treaty was to acquire land for timber, not settlement, and neither party to the treaty thought that continued exercise of usufructuary rights would interfere with lumbering.

The treaty negotiations indicate that both parties expected the Chippewa to remain on the lands for many years. In fact, Dodge assured them that "[i]t will probably be many years before your Great Father will want all these lands for the use of his white Children." 1837 Treaty Journal at 146 (Plaintiffs' Ex. 49).

Dodge did not explain the phrase "at the pleasure of the President" to the Chippewa, and the testimony of Dr. Nichols established that the Chippewa would *not* have understood "at the pleasure of the President" to give him unrestricted discretion. The State argues that the traders, half-breeds, and missionaries at the treaty negotiations would have supplemented the official translations and ensured that the Chippewa understood all of the provisions of the treaty. Dr. Cleland testified persuasively, however, that all of these groups had their own interests to protect and that those interests were not identical with the interests of the Chippewa. Furthermore, the State's position is based upon speculation rather than hard evidence of actual translations.

Despite the requirement that the President only revoke the usufructuary rights in good faith, President Taylor issued the 1850 executive order when the Chippewa had been causing no trouble and their land was not needed for immediate settlement. The Seventh Circuit came to this conclusion in *Lac Courte Oreilles Band v. Voigt*, 700 F.2d 341, but it is even more compelled here where a full trial record shows that the Chippewa were basically peaceable and contributing valuable products to the settlers. *See, e.g., infra* at p. 809. Moreover, the Mille Lacs Band refused to join with other Chippewa in uprisings. *See infra* at 819. To the contrary, not only did they refuse, but they came to the aid of the United States troops and white settlers during the uprising of 1862. *Id.*

To be sure, the record shows instances of cultural differences where Chippewa and settlers had varying perceptions which led to misunderstandings. Perhaps the most striking single piece of trial evidence to illustrate this was about glass windows. Settlers regarded them as something to look out of, and the Indians regarded them as something to look into, oblivious of the settlers' concept of privacy. Other examples include Indians' cultural expectation that food be shared with hungry travelers or that animals in the fields constituted game. Cleland Report at 72–74. The record was bare of evidence of misbehavior, however.

The purpose behind the 1850 order was to advance the desire of some Minnesotans to expand their economy, rather than in consideration of the needs and interests of the Chippewa as the treaty obligated. Revocation of usufructuary rights by the 1850 order was not lawful because it was beyond the President's discretion and violated the good faith requirement of the 1837 treaty.

### D.

▮ The Counties contend that the court does not have jurisdiction to review the 1850 order. They argue that Congress delegated its authority to abrogate the usufructuary

rights guaranteed by the 1837 treaty when it ratified that treaty without modifying the "at the pleasure of the President" phrase. They contend that review of the executive order would be inappropriate because it presents a political question as in *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

The Band responds that regardless of the President's general authority to negotiate treaties, President Taylor did not have authority to abrogate a treaty right and to remove the Indians without their consent. This does not present a political question; judicial review of the validity of a presidential order is appropriate where necessary to resolve a case within the court's jurisdiction. *Cole v. Young*, 351 U.S. 536, 557, 76 S.Ct. 861, 873, 100 L.Ed. 1396 (1956); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952).

Although the President has the "power, by and with the consent of the Senate, to make treaties", Congress has plenary authority over Indian affairs. U.S. Const. art. II, § 2; *Lac Courte Oreilles Band v. Voigt.* Only Congress can abrogate an Indian treaty right by expressing that intention clearly and plainly. *See, e.g., United States v. Dion*, 476 U.S. 734, 738, 106 S.Ct. 2216, 2219, 90 L.Ed.2d 767 (1986); *Lone Wolf v. Hitchcock*, 187 U.S. 553, 567, 23 S.Ct. 216, 222, 47 L.Ed. 299 (1903). Ratification of the 1837 treaty was not a clear and plain expression of Congressional intent to allow the President to remove the Chippewa without their consent, particularly because the treaty does not even mention removal.

 Review of the 1850 executive order does not present a nonjusticiable political question. The political question doctrine counsels abstention against judicial intervention in certain types of cases involving the other branches of government. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). It has been applied in the area of foreign policy. *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). Whether a case presents a political question depends on such factors as:

(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?

*Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

In *Goldwater* members of Congress sued the President, alleging that he did not have authority to terminate unilaterally a defense treaty with Taiwan. The Supreme Court remanded to the district court for dismissal without issuing an opinion. In concurring Justice Rehnquist, joined by three other justices, wrote that the question was a nonjusticiable political question:

I am of the view that the basic question presented by the petitioners in this case is "political" and therefore nonjusticiable because it involves the authority of the President in the conduct of our country's foreign relations and the extent to which the Senate or the Congress is authorized to negate the action of a President.

*Goldwater* at 1002, 100 S.Ct. at 536. Justice Rehnquist distinguished the situation from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), where the President's decision to seize the steel mills would have a profound domestic impact on private citizens. The dispute raised in *Goldwater* was between coequal branches of government with adequate resources to protect their interests, and the effect of the President's action was "entirely external to the United States, and [fell] within the category of foreign affairs." *Id.*, 444 U.S. at 1004–1005, 100 S.Ct. at 537–538, quoting *United States v. Curtiss–Wright Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). This position was not adopted by the court, and *Goldwater* is distinguishable from the case before this court.

Here review of the 1850 executive order will not interject the judiciary in a dispute between Congress and the President. The United States in fact favors the review, and other courts have reviewed it without constitutional problems. *Lac Courte Oreilles Band v. Voigt.* Moreover, the 1850 order

would have had a profound effect on private citizens. For all these reasons review of the order does not present a nonjusticiable political question.

### E.

■ Finally, the Band argues that in any event, the 1850 executive order was not intended to apply to the Mille Lacs Band and was intentionally repealed by the government. It points to the 1851 suspension of the removal operation and the 1854 and 1855 treaties as evidence that the executive order was repealed. It maintains that the correspondence exchanged during the Rum River controversy indicates that the usufructuary rights of the Mille Lacs Band continued to exist in 1855.

The defendants respond that there is no document repealing the executive order. They assert that failure to enforce the executive order does not indicate that it was revoked or repealed because a fundamental rule of statutory construction is that "a law shall not be deemed repealed by the failure to use such law." Minn.Stat. § 645.41 (1992). They contend that the removal portion of the executive order was revoked by the 1855 treaty, but that the 1855 treaty did not revoke the portion of the order extinguishing usufructuary rights.

■ The test used to determine whether a statute has been repealed is also used for an executive order. *Feliciano v. United States*, 297 F.Supp. 1356, 158–59 (D.P.R.1969). A repeal may be explicit or implicit, but repeals by implication are not favored. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153–54, 96 S.Ct. 1989, 1992–93, 48 L.Ed.2d 540 (1976); *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503–04, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). The ultimate question is whether repeal of a prior statute was intended. *Id.*

The evidence shows that the entire removal operation was suspended in 1851. The only subsequent removal attempt was the policy of paying annuities only to those who removed, but Commissioner Manypenny and Governor Gorman abandoned even this passive policy in 1853. The federal government encouraged the Chippewa to exercise their usufructuary rights by giving them guns, traps, ammunition, and other hunting, fishing, and gathering tools in the 1853 and 1854 payments.

The correspondence written during the Rum River dam crisis also indicates that the Mille Lacs Band continued to have a right to hunt, fish, and gather on the 1837 ceded territory. Governor Gorman's February 16, 1855 letter to Commissioner Manypenny explains that the lumbermen were working on lands "surveyed and sold by the United States" on which "the Indians have no other treaty interests except hunting and fishing." The letter from Lieutenant Hamilton also indicates that both the lumbermen and the Chippewa believed that the 1837 treaty protected their wild rice crops.

The full record indicates that the suspension order issued by Commissioner Lea on June 3, 1851 (Plaintiffs' Ex. 94) halted enforcement of the 1850 order, and there is no evidence that the suspension order was ever repealed. Moreover, the 1854 and 1855 treaties created reservations on the 1837 and 1842 ceded territories and promised that the Chippewa would not have to remove. These provisions are completely contrary to the 1850 order. The absence of a document formally repealing the 1850 order is not surprising because executive orders were not even numbered until 1907; executive order records were generally chaotic before then. Note, *Presidential Power: Use and Enforcement of executive orders*, 39 Notre Dame L.Rev. 44, 46, n. 17 (1963). Government policy between 1851 and 1860 indicates that the government no longer expected the Chippewa to remove and that it expected the Chippewa to continue to hunt, fish, and gather on their ceded lands with the assistance of goods provided by the government.

■ Moreover, the 1850 executive order was never enforced against the Mille Lacs Band, and the removal portion of the order was enforced against other Chippewa bands for only one and one-half years. Although the executive branch could not repeal a statute by failing to enforce its provisions, it can make its own regulations ineffective by failing to enforce them for a long period of time.

*Meehan v. Macy,* 392 F.2d 822, 838–39, n. 43 (D.C.Cir.1968). The Band did not remove, but continued to receive its annuity payments and other benefits throughout the period following the 1850 order.

The revocation of hunting, fishing, and gathering rights was never enforced against any of the Chippewa. The record indicates that the executive branch intended to repeal the 1850 executive order.

## VIII.

One of defendants' major points is that the usufructuary rights guaranteed in 1837 were extinguished by the 1855 treaty. They rely on this sentence in that treaty:

> And the same Indians do further fully and entirely relinquish and convey to the United States, any and all right, title or interest, of whatsoever nature the same may be, which they may now have in, and to, any other lands in the territory of Minnesota or elsewhere.

1855 treaty, art. 1.

### A.

■ The defendants argue that the usufructuary privilege was extinguished by this language because the privilege was an incident of Indian title. They maintain that the Chippewa understood that they were losing their sovereignty on off-reservation lands when their reservations were created and that they agreed to give up their usufructuary privilege as part of a cultural revitalization movement. They assert that the authorization act for the 1855 treaty shows that Congress intended to extinguish the usufructuary privilege.

They contend that the 1855 treaty language in Article I conveying all right, title or interest in or to lands in Minnesota or elsewhere must refer to lands previously ceded because the first sentence of that Article already dealt with the cession of new territory. They argue that this language should not be interpreted as redundant and that an interpretation restricting it to the land ceded in the 1855 treaty would render it meaningless. They argue that whether the Chippewa continued to hunt and fish off-reservation

after 1855 is irrelevant because the parties did not intend to prevent the Chippewa from hunting, fishing, and gathering off their reservations, but rather to subject them to state regulation of these activities. They contend that conservation laws were enforced against the Chippewa and that the State did not waive its regulatory authority even if enforcement was inconsistent. They cite *Oregon Department of Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) in support.

The plaintiffs respond that this language in the 1855 treaty is not clear, and the canons of construction for Indian treaties prohibit interpretation of the treaty without considering the Chippewa understanding. They assert that neither the Chippewa nor the United States intended for the Chippewa to relinquish the usufructuary privilege guaranteed by the 1837 treaty. They contend that the Chippewa continued to hunt, fish, and gather on the 1837 ceded territory after the 1855 treaty indicating that they believed their usufructuary privilege still existed.

■ A "treaty must ... be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Washington v. Washington Commercial Passenger Fishing Vessel,* 443 U.S. 658, 676, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979). Congress can abrogate Indian treaty rights only when its intention is expressed clearly and plainly. *United States v. Dion,* 476 U.S. 734, 738, 106 S.Ct. 2216, 2219, 90 L.Ed.2d 767 (1986); *Lone Wolf v. Hitchcock,* 187 U.S. 553, 567, 23 S.Ct. 216, 222, 47 L.Ed. 299 (1903).

> What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.

*Id.,* 476 U.S. at 739–40, 106 S.Ct. at 2220. Thus, the usufructuary privilege granted the Chippewa in 1837 could be extinguished by the 1855 treaty only if it "expressly refers to termination of the usufructuary rights or if the circumstances and legislative history surrounding the treaty make clear that Con-

gress intended such an abrogation." *Lac Courte Oreilles Band v. Voigt* at 362.

The 1855 treaty does not mention hunting, fishing, and gathering rights. The treaty language about conveyance of "all right, title or interest" is not a clear reference to the usufructuary privilege. The intent of the parties and the understanding of the Chippewa must therefore be considered. Study of the record shows that the circumstances and legislative history of the 1855 treaty indicate that Congress did not intend to abrogate that privilege and that the Chippewa did not understand the treaty to have that effect.

The linguistic and anthropological evidence at trial showed that the Chippewa understood the language relinquishing all right, title or interest in and to any other lands in Minnesota or elsewhere to transfer all of their unceded lands not retained as reservations, but they would not have considered it to have any effect on lands ceded earlier or on rights guaranteed by previous treaties. The phrase "right, title and interest in and to lands" has no Chippewa equivalent. The closest translation into their language would convey only that the Chippewa were giving up their remaining lands.

The absence of any reference to the guaranteed usufructuary privilege also shows that the Band would not have understood that it was giving up its privilege. Band members would have starved if they were confined to the boundaries of their reservation. Their representatives at the 1855 treaty would not have knowingly given up the guaranteed privilege without any discussion. The lack of discussion by the Chippewa about a privilege that was so important to them shows that they did not understand the treaty to have what the defendants urge is a "plain meaning." *See Lac Courte Oreilles Band v. Voigt* at 363–64 (silence in the 1854 treaty about usufructuary rights guaranteed by the 1837 and 1842 treaties means that the Indians "believed their right to use ceded land for traditional purposes to be secure and unaffected"); *United States v. Michigan,* 471 F.Supp. 192, 262 (W.D.Mich.1979), *aff'd in relevant part,* 653 F.2d 277 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981) (Indians would not have

understood language relinquishing all claims for land, money or other thing guaranteed by any former treaty to include usufructuary rights guaranteed by an earlier treaty particularly because the usufructuary rights were not mentioned during the negotiations).

The practical construction of the 1855 treaty also shows that the Chippewa did not in fact understand it abrogated their usufructuary privilege. The Chippewa continued to hunt, fish, and gather off-reservation after the 1855 treaty. If they had understood that the 1855 treaty extinguished their usufructuary privilege, they would not have felt free to continue such activities on the 1837 ceded territory because that could have jeopardized their continued residence on the newly created reservations. *See Lac Courte Oreilles Band v. Voigt* at 364 (relying on evidence that the Chippewa continued to hunt and fish on the ceded territory to support the conclusion that the 1854 treaty did not abrogate these rights); *Seufert Bros. Co. v. United States,* 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1919) (continued fishing "shows clearly that [the Indian] understanding of the treaty was that they had the right to resort to these fishing grounds and make use of them in common with other citizens of the United States").

The trial testimony of three Band members indicates that hunting, fishing, and gathering still remain an important part of the culture, lifestyle, and economy of Band members. Testimony about compliance with state fish and game laws is not necessarily evidence that the usufructuary rights have been extinguished. Testimony at trial showed that two of the three Chippewa witnesses had been cited by authorities for violations of these laws, and Herman Kegg spent two months in jail. He also testified that he had to be careful not to endanger the license for his bait business in order to maintain his livelihood. Moreover, it would be unreasonable to expect Band members to incur criminal penalties to show that they still believed their usufructuary privilege exist. *See Passenger Fishing Vessel,* 443 U.S. at 669, n. 14, 99 S.Ct. at 3066, n. 14.

The Chippewa also complained to federal officials that state enforcement of game regu-

lations violated their rights under the 1837 treaty. In 1897 the United States Attorney argued that imprisonment of two Chippewa charged with violating Minnesota game laws was wrong because the Chippewa reserved the right to hunt and fish off-reservation in their treaties. Scott to COIA, 4–15–1897 (Plaintiffs' Ex. 284) (attached newsclipping).[21] In 1925 the Bureau of Indian Affairs responded to an inquiry about off-reservation usufructuary rights in Wisconsin under the 1837 and 1842 treaties with a statement that "No record has been found of the abrogation of the treaty provisions above cited." Merritt to Hammitt, Dec. 9, 1925 (Plaintiffs' Ex. 31). But cf. State's Exhibits 75, 77, 78, and 83 (responding to questions about 1837 usufructuary rights, but indicating that those rights were abrogated by the 1850 executive order or the 1855 treaty).

Moreover, the evidence shows that the United States did not intend to extinguish the 1837 usufructuary rights. The government knew how to draft language explicitly revoking usufructuary rights. See 1850 executive order; 1855 treaty with Sault St. Marie Chippewa art. 1, 11 Stat. 631 (Plaintiffs' Ex. 128); 1837 treaty with Sauk and Foxes, art. 1, 7 Stat. 543 (Plaintiffs' Ex. 153); 1846 Treaty with Winnebago, art. 4, 9 Stat. 878 (Plaintiffs' Ex. 154); 1865 Treaty with the Middle Oregon Tribes, art. 1, 14 Stat. 751 (Plaintiffs' Ex. 155). It chose not to use similar language in the 1855 treaty. Manypenny intended for the second sentence of Article I of the 1855 treaty to extinguish Chippewa land claims, especially those of the Pillager and Lake Winnibigoshish bands, to unceded lands in northwestern Minnesota, not the 1837 usufructuary rights. This interpretation does not render the second sentence of Article I meaningless; it merely limits the language to its intended effect.

The authorization act for the 1855 treaty does not support the interpretation presented by the defendants. The act directed the President "to cause negotiations to be entered into with the Chippewa Indians, for the extinguishment of their title to all the lands owned and claimed by them in the Territory of Minnesota and State of Wisconsin." 10 Stat. 598. This provision would not apply to the land ceded in the 1837 treaty, however, because that land was no longer owned and claimed by the Chippewa. Moreover, the usufructuary privilege guaranteed by the 1837 treaty is not just an incident of Indian title; it is a treaty-recognized right of use. Lac Courte Oreilles Band v. Voigt at 352–54.

The authorization act also directed that the 1855 treaty include a provision that "the Law of the United States and the Territory of Minnesota shall be extended over the Chippewa territory in Minnesota when ever the same may be ceded, and the former shall cease to be Indian Country." Id. This provision was not included in the 1855 treaty, but even if it had been it would apply only to lands ceded in that treaty.

If the government had intended to extinguish the 1837 privilege, it would have included a provision abrogating that privilege in the 1854 treaty because most of the bands that signed the 1837 treaty attended that treaty negotiation and were not invited in 1855. The historical record shows that neither the Chippewa nor the United States understood that the 1855 treaty would abrogate the usufructuary rights guaranteed by the 1837 treaty.

In this case both parties to the 1855 treaty assert that they did not intend to extinguish usufructuary rights in the 1855 treaty. The fact that the parties to the treaty agree on the meaning of the interpretation of it is of significant importance. See Restatement 2d of Contracts, § 201(1) (1981) ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning."); Washington Fishing Vessel, 443 U.S. at 675–76, 99 S.Ct. at 3069 (A treaty between the United States and an Indian tribe is essentially a contract between two nations).

The defendants rely on Oregon Dep't. of Fish and Wildlife v. Klamath Indian Tribe,

---

21. The article actually mentions 1838 and 1855 as the treaty dates. The 1837 and 1854 treaties were not ratified until those years, however, and the references appear to be to the 1837 and 1855 treaties. The article also notes that the Minnesota Attorney General agreed with the statement made by the United States Attorney.

473 U.S. 753, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985). They contend that almost identical treaty language in *Klamath* was held to cede any reserved hunting and fishing rights even though the usufructuary rights were not specifically mentioned in the treaty.

In *Klamath* the plaintiff tribe had ceded all of its right, title and claim to certain lands in an 1864 treaty, but had reserved a 1.9 million acre reservation. The treaty gave the tribe "the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits." *Id.* at 755, 105 S.Ct. at 3422. No right to hunt or fish outside the reservation was mentioned. *Id.* A large portion of the intended reservation was excluded as a result of a survey error. *Id.* at 757, 105 S.Ct. at 3423. In 1901 the tribe agreed to "cede, surrender, grant, and convey to the United States all their claim, right, title and interest in and to" the land mistakenly excluded in exchange for monetary compensation. *Id.* at 760, 105 S.Ct. at 3425.

The 1901 agreement in *Klamath* did not contain any reference to hunting and fishing rights, but it stated that "nothing in this agreement shall be construed to deprive [the tribe] of any benefits to which they are entitled under existing treaties not inconsistent with the provisions of this agreement." *Id.* at 761, 105 S.Ct. at 3425. After the state of Oregon enforced its conservation laws against the tribe on the lands ceded in 1901, the tribe sued the state. *Id.* at 762, 105 S.Ct. at 3425. The tribe argued that the Indians would not have understood that the 1901 agreement abrogated their hunting and fishing rights.

When the case reached the Supreme Court, it acknowledged that ambiguities should be resolved in the favor of Indians, that the language of a treaty should be viewed in its historical context, and that "Indians may enjoy special hunting and fishing rights that are independent of any ownership of land." *Id.* at 765–76, 105 S.Ct. at 3428. It concluded, however, that the language of the 1901 agreement forfeiting all of "the tribe's claim, right, title and interest in and to" the misappropriated land included the previously reserved hunting and fishing rights.

Unlike the 1864 treaty in *Klamath*, the 1837 treaty at issue in this case explicitly gave usufructuary rights to the Band on ceded territory. The usufructuary rights in *Klamath* were described in the treaty as rights that could be exercised only on reservation lands owned by the bands. The 1837 treaty on the other hand guaranteed hunting, fishing, and gathering rights on the lands being ceded.

Moreover, the Klamath tribe representatives spoke English, and the tribe was represented by an attorney during the negotiations. The decision in *Klamath* turned on a different historical background, and it is not controlling here.

Neither the United States nor the Chippewa intended to extinguish in the 1855 treaty the usufructuary privilege guaranteed by the 1837 treaty. The privilege continued to exist after the 1855 treaty.

## B.

Plaintiffs argue that even if the 1855 treaty were analyzed without regard to the understanding of the Chippewa, it could not be read to extinguish the usufructuary privilege.

The Landowners argue that the language used in 1837 to convey the privilege created either a *profit a prendre* that was an interest in land extinguished by the portion of the 1855 treaty relinquishing all title to any land in Minnesota or a license extinguished by subsequent sale of land. They contend that there is no evidence that the government intended to convey any exemption from regulatory authority to the Indians.

The Band responds that nineteenth century lawyers would not have considered the privilege an interest in or to land. They point to the testimony of Dr. Thomas Lund. The Band also argues that if the Landowners are correct that there is more than one interpretation of the 1855 treaty language, then the ambiguity must be interpreted in favor of the Indians. It asserts that the government would not have encumbered the ceded territory with a *profit a prendre* or a license

because lands that were not fenced were open to anyone for hunting, fishing, and gathering. It asserts that the government intended to convey authority to take fish and game just as a modern fishing or hunting license does.

The drafters of the 1837 treaty intended for the treaty to allow the Chippewa to continue to live off the ceded lands at the pleasure of the President. They chose to convey this interest with this language:

> The privilege of hunting and fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States.

Dr. Lund testified that the 1837 treaty language conveyed a privilege to take fish or game if the takers could reach the fish or game without committing a trespass. He also testified that the drafters of the 1837 treaty would not have considered this to be a right, title or interest in lands. Examination of the nineteenth century law supports his opinion.

 The American common law rule is that the sovereign owns fish and game in trust for its citizens. In Minnesota the State holds wild fish and game "in its sovereign capacity for the benefit of all the people of the state . . . [and a] person may not acquire a property right in wild animals, or destroy them, unless authorized under the game and fish laws or sections 84.09 to 84.15." Minn. Stat. § 97A.025. Property owners do not own the wildlife on their property, and they may take the wildlife only as authorized by the sovereign.[22] A landowner does, however, have "a qualified interest in that it is he who has the exclusive right to reduce game to possession." *Minnesota Valley Gun Club v. Northline Corp.*, 290 N.W. 222, 224 (Minn. 1940).

 Conveyance of a hunting or fishing right cannot transfer ownership of wildlife because the state owns fish and game. The conveyance of hunting and fishing rights by property owners merely conveys a right to enter the land for that purpose. Such rights are normally classified as a *profit a prendre*.

 Unlike a private property owner, however, the United States may convey more than a right to enter lands to hunt and fish. As a sovereign, it may convey its ability to regulate taking of the wildlife it owns. The United States used this power in 1818 and 1854 when it negotiated treaties with Great Britain allowing British citizens to fish in waters claimed by the United States. Treaty of Oct. 20, 1818, 8 Stat. 248 and Treaty of June 5, 1854, 10 Stat. 1089.

An understanding of the general historical circumstances in 1837 indicates that a similar right was conveyed by the United States in the 1837 treaty. In the nineteenth century the public was allowed to hunt, fish, and gather on all lands not developed, enclosed or posted. An abundant amount of land was open for these purposes, and the drafters of the 1837 treaty would not have focused on whether the Chippewa would have access to land to hunt, fish, and gather. The 1837 treaty does not mention access or entry. It seems unlikely that the United States would have given the Chippewa an implied right of access to the 1837 ceded territory because such right could have eventually prevented certain uses of the ceded territory. The Landowners argue that conveyance of hunting and fishing rights without conveyance of the right to access constituted only a license or *profit a prendre* that was later extinguished by sale of land or the 1855 treaty. They cite cases where similar language to the treaty conveyed in them a *profit a prendre* or a revocable license, but those cases do not consider that a sovereign could convey an exemption from regulation without conveying

22. *State v. Mallory*, 73 Ark. 236, 83 S.W. 955 (1904), cited by the Landowners for the proposition that language similar to that used in the 1837 treaty creates a *profit a prendre*, is not to the contrary. In *Mallory* the issue was whether the state could prohibit non-resident property owners from hunting on their property while allowing resident property owners to do so. In dicta, the court mentioned that a right to take game on owned land is "a right inhering in the soil, and not a mere right to prevent an invasion of the possession of the owner", but as the Landowners concede in their brief, the State of Minnesota owns wildlife in trust for all of its citizens.

a right of access. The cases are therefore inapposite.

## IX.

 The Landowners argue that the Band's usufructuary rights were terminated by land patents issued by the government. They also contend that the State now owns the beds of the navigable waterways and that the United States could not convey any interest to those waterways.

The plaintiffs respond that there is no evidence that the Chippewa understood that their usufructuary privilege would be subject to automatic termination whenever a portion of the ceded territory was transferred by the federal government. They assert that the 1836 Treaty with the Ottawa and Chippewa, 7 Stat. 491 (Plaintiffs' Ex. 161), demonstrates that the government knew how to draft language to terminate usufructuary privileges when they were conveyed by the United States.[23] They contend that the government would have used similar language in the 1837 treaty if it wanted to accomplish this purpose. They also point to the February 16, 1855 letter from Governor Gorman to Commissioner Manypenny as evidence that the usufructuary privilege was not extinguished by the survey and sale of land.

There is no evidence that the Chippewa understood that the usufructuary privilege would be terminated whenever land was surveyed and sold. They understood that it would only be terminated by the President in good faith. As Judge Doyle observed during proceedings after the Seventh Circuit remanded the *Lac Courte Oreilles Band v. Voigt* litigation:

> [T]here is no evidence to support a finding that the Chippewa understood at treaty time those [usufructuary rights reserved in the 1837 and 1842 Treaties] could be diminished ... by some amorphous aggregate of sporadic non-governmental decisions by individuals to acquire private ownership of parcels of the ceded territory ... To construe the treaties as embodying some such potential for *de facto* diminution in response to non-Indian settlement is

totally at odds with the rule that these treaties must be construed consistently with the Chippewa's understanding of their meaning.

*Lac Courte Oreilles Band v. Wisconsin,* 653 F.Supp. 1420, 1433 (W.D.Wis.1987).

The evidence also shows that the government did not intend to extinguish the usufructuary privilege by survey and sale. Only a year before the 1837 treaty, the government had negotiated a treaty limiting a hunting right "until the land is required for settlement." 1836 Treaty with the Ottawa and Chippewa, art. 13, 7 Stat. 491 (Plaintiffs' Exhibit 161). That same year the Attorney General issued an opinion that this language would extinguish the hunting right whenever a tract of land was disposed of to individuals by the United States. 3 Op.Atty.Gen. (U.S.) 206 (April 20, 1837) (State's Ex. 12). Government officials would have been aware of this treaty and the opinion of the Attorney General and could have used similar language in the 1837 treaty if they had intended to subject the usufructuary privilege to piecemeal termination.

Moreover, on February 16, 1855, Governor Gorman, a lawyer, wrote to Commissioner Manypenny that: "The lands occupied by the timbermen had been surveyed and sold by the United States and the Indians have no other treaty interest except hunting and fishing." Gorman's statement indicates that he believed lands could be surveyed and sold without extinguishing the privilege.

Finally, the Supreme Court has rejected the argument that the issue of land patents extinguished a usufructuary privilege. In *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905), the court examined treaty language giving Indians "the right of taking fish at all usual and accustomed places" and "of erecting temporary buildings for curing them." The Court concluded that this language gave the Indians a right to cross the land to the river. *Id.* at 381, 25 S.Ct. at 664. Based on this interpretation of the treaty language, the Court concluded that the Land Department could

---

**23.** It states "The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, until the land is required for settlement." *Id.*

not have exempted any land from the treaty. *Id.* at 382, 25 S.Ct. at 664.

The Land Department could not exempt property from the 1837 treaty merely by the broad wording of its patents. Only Congress could have abrogated the treaty reserved right with plain and clear language.

In *Winans* the Court also rejected the argument that usufructuary rights could not be exercised on the shores of navigable waters because the United States had transferred control of the shores and waters to the states. It concluded that the United States properly exercised its power to grant the Indians a fishing right and that the state government was bound by this grant. *Id.* at 383–84, 25 S.Ct. at 665. The United States made a similar grant in the 1837 treaty, and the State is bound by it.

Although the patent process did not extinguish the privilege, exercise of the 1837 usufructuary rights should be limited to lands in the ceded territory that are not privately owned because no right of access was included in the privilege. In this sense, privately owned lands do not include public lands formerly in private ownership or private lands open to public hunting, fishing, and gathering. *Lac Courte Oreilles Band v. Wisconsin,* 653 F.Supp. 1420, 1432 (W.D.Wis.1987); *see infra* pp. 834–835. *See also Kimball v. Callahan,* 493 F.2d 564, 566–69 (9th Cir.), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974). Consistent with this authority, the Band does not seek by this action to exercise usufructuary rights on private property.

## X.

Included among the proposed conclusions of law submitted by the Band and the United States prior to trial were three conclusions said to define the general nature of the privilege:.

1. With the exception of commercial harvest of standing timber and the taking of cultivated crops, the Mille Lacs Band's hunting, fishing and gathering rights under the 1837 treaty are not limited as to species, varieties, origin, purpose, use, time, place or manner, except to the extent required for the conservation of the plant or animal species or for the protection of public safety.

2. In exercising their 1837 treaty rights, plaintiffs may utilize improvements in techniques, methods, devices and gear.

3. The State may not regulate, license, condition, tax or otherwise encumber the hunting, fishing and gathering rights of the [Mille Lacs Band] provided for in the 1837 treaty unless: (1) such regulations are reasonable and necessary to conserve a particular species in a particular area or to prevent a substantial risk to public safety; (2) the regulations do not discriminate against the plaintiffs; (3) the Mille Lacs Band has failed to adopt effective conservation or public safety regulations; and (4) the State regulations are the least restrictive alternative available to accomplish the specific conservation or public safety purpose.

The Counties move that the portion of the Band's post-trial brief addressing these proposed conclusions and the conclusions themselves be stricken. In the alternative, they request that they be allowed to file a response. They argue that the bifurcation order and subsequent conduct of this litigation indicated that such issues would not be addressed in Phase I. They again remind that they were not allowed to obtain discovery from the Band about its finances or revenues from gaming operations.

The State also requests that these proposed conclusions not be considered at this time. It argues that the phrase "the general nature of such rights" in the bifurcation order has not been defined. It believes the intent was to determine any existing usufructary rights held by plaintiffs, not the type of issues raised by the plaintiffs in the proposed conclusions. It asserts that these issues are beyond the scope of Phase I and that it has not had an opportunity to present relevant evidence. The State also argues that the conclusions are based on incomplete and misleading evidence.

The Band responds that the parties stipulated to the order bifurcating the case which

reserved only "resource allocation issues and the validity of particular measures to regulate the exercise of such rights" for Phase II. It asserts that the proposed conclusions address appropriate Phase I issues. The State must have understood these issues were part of Phase I in light of its discovery requests focusing on commercial harvesting and state regulation. The Counties also asked an interrogatory about state regulation. The Band further points out that the State identified "whether a commercial component is included in the claims" as a major issue to be decided in Phase I. Notice to the defendants that such issues would be decided in Phase I included: interrogatories about whether the 1837 treaty privilege included commercial harvests; summaries of expert testimony; and its proposed findings of fact and conclusions of law served on June 2, 1994. It contends that postponing these issues until Phase II would waste judicial resources because the historical evidence would have to be repeated.

On April 9, 1991, the court signed a bifurcation order to which the parties had stipulated. It provided that the December 12, 1990 order providing pre-trial deadlines would "govern pre-trial procedures regarding the threshold issues presented in this case, namely whether plaintiffs' rights to hunt, fish and gather under the Treaty of 1837 continue to exist, whether they extend to lands now or previously in private ownership, and the general nature of such rights." It also provided:

to the extent that the above issues are not dispositive of the case and the Court holds that plaintiffs' 1837 treaty rights continue to exist, further proceedings to determine resource allocation issues and the validity of particular measures to regulate the ex-

ercise of such rights shall not be subject to the December 12, 1990 Pre–Trial order. Order, Civ. 4–90–605 (D.Minn. April 9, 1991).

This division of the issues has subsequently been referred to as the Phase I and Phase II division. The issues reserved for any second trial were resource allocation issues and the validity of particular measures to regulate the exercise of the privilege. The general nature of the rights under the treaty was included in Phase I and depends on interpretation of the treaty following a legal and historical analysis. There is no reason to postpone consideration of the general nature of the rights to a future trial where the same evidence would have to be presented again. It would be contrary to the agreement of the parties and to reasonable efficiency.

The history of this case shows that the defendants knew or should have known that the general nature of the rights was a subject for Phase I and should have raised any objection to their consideration in this phase long ago.[24] Defendants in fact helped develop the trial record related to the general nature of the rights. The summaries of expert reports and the expert reports themselves informed defendants that expert witnesses would be addressing these issues. The plaintiffs served their proposed findings of fact and conclusions of law on defendants on June 2, 1994, but no party objected before or during the lengthy trial. The State itself submitted a proposed conclusion that Band members Kegg and Dunkley "testified that commercial harvest of fish and game was not consistent with 'the Indian way,' and that such commercial activity would be unacceptable in the Chippewa community" indicating that it understood the general issue of commercialization was a Phase I subject. It

24. The defendants did not raise these concerns about the scope of Phase I until the week of July 18, 1994, with the exception of the State's earlier objection to a Band interrogatory about whether the 1837 privilege included commercial purposes. Although the State objected to that question, it did not withdraw its pending discovery requests on the commercial harvest issue or further develop this objection.

The Landowners argue that they relied on language in orders issued on April 9, 1994 and May

13, 1994 that stated the first phase of the trial would determine "whether the band retains any rights under the treaty and whether those rights extend to land owned privately." They claim that the bifurcation order was modified by failure to include "the general nature of the rights" in these April and May orders. An order is not modified by implication, but rather by a subsequent order. Language summarizing the bifurcation order in the text of an opinion cannot be construed to revise an earlier order.

cannot now be heard to complain that it would have presented evidence on this subject if it had known it would be resolved in Phase I.

■ The motion by the Counties to strike the plaintiffs' proposed conclusions and the portion of their post-trial brief addressing these issues should be denied.[25] The record at trial includes voluminous evidence about the intent of the parties to the 1837 treaty, and no party can be prejudiced by findings and conclusions based on evidence that was developed with their participation. The proposed conclusions should only be adopted to the extent they are solidly based on the record, however.

■ In 1837 the Chippewa used all of their surrounding natural resources to survive. They understood the phrase "hunting, fishing and gathering the wild rice" used in the 1837 treaty to mean "living off the land." *See infra* at p. 796–797. They understood that the government wanted to harvest the pine timber, and they gave up any right to harvest that resource, but they did not understand the treaty to impose any other limits on the types of resources that they could harvest. They also did not understand that there were any restrictions on the time, place, or manner of the exercise of the privilege. The validity of particular measures attempting to regulate the taking or harvesting of resources is for Phase II.

The evidence showed that the parties intended to permit continued use of the privilege for commercial purposes. In 1837 the Chippewa were engaged in the sale of harvested resources in the fur trade and to settlers and lumbermen. *See infra* at p. 792–793, 819. They understood that they would be able to continue these efforts. Although Band members testified at trial that "commercialization" is not the "Indian way", they also testified that they and their forebears have traded and sold furs, deer hides, wild rice, berries, and other resources to make a living. Boyd testified that her father

paid her mother's hospital bills by selling furs. The record reveals that the privilege granted in 1837 includes the right to harvest the resources for commercial purposes. Limits to this right because of resource allocation issues is a question for Phase II.

The privilege granted in 1837 was not limited to use of any particular techniques, methods, devices, or gear. The Chippewa incorporated rifles and other Euro–American technology into their hunting, fishing, and gathering before the 1837 treaty and continued to use new technology after the treaty. Neither the treaty journal nor the language in the treaty indicates that the Band should be confined to techniques, methods, devices, and gear existing in 1837. Whether specific subsequent technology might be regulated for conservation or public health and safety reasons is not now before the court.

■ The legal standards for state regulation of Indian usufructuary rights are clearly established and will be relevant to Phase II issues. The State may regulate the exercise of the privilege in the interest of conservation "provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup Tribe v. Dep't of Game*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). To demonstrate that any regulation meets appropriate standards, the State "must demonstrate that its regulation is a reasonable and necessary conservation measure *and* that its application to the Indians is necessary in the interest of conservation." *Antoine v. Washington*, 420 U.S. 194, 207, 95 S.Ct. 944, 952, 43 L.Ed.2d 129 (1975) (emphasis in original); *see also Washington v. Washington Commercial Passenger Fishing Vessel*, 443 U.S. at 682–83, 99 S.Ct. at 3072–73; *United States v. Michigan*, 653 F.2d 277, 179 (6th Cir.1981); *Lac Courte Oreilles Band v. Wisconsin*, 668 F.Supp. 1233 (W.D.Wis.1987). The State may also regulate the privilege to ensure public health and safety if the regulations do not discrimi-

---

**25.** The alternative request by the Counties to permit the filing of a response is also without merit. The defendants have already had opportunity to respond and did present memoranda and objections in opposition to plaintiffs' pro-

posed findings and conclusions which were served on them on June 2, 1994. The Counties' last submission to the court was filed on July 29, 1994.

nate against the Indians and are "reasonable and necessary to prevent or ameliorate a substantial risk to the public health or safety." *Lac Courte Oreilles Band v. Wisconsin,* 668 F.Supp. at 1241–42. A public health and safety regulation is reasonable if it meets a three part test:

First, the state must demonstrate that there is a public health or safety need to regulate a particular resource in a particular area. This requires a showing by the state that a substantial detriment or hazard to public health or safety exists or is imminent. Second, the state must show that the particular regulation sought to be imposed is necessary to the prevention or amelioration of the public health or safety hazard. And third, the state must establish that application of the particular regulation to the tribes is necessary to effectuate the particular public health or safety interest. Moreover, the state must show that is regulation is the least restrictive alternative available to accomplish its health and safety purposes.

*Id.* at 1239.

■ The State may not impose its own regulations if the Band can effectively self-regulate and if tribal regulations are adequate to meet conservation, public health, and public safety needs. *United States v. Michigan,* 653 F.2d at 279; *Lac Courte Oreilles Band v. Wisconsin,* 668 F.Supp. at 1241–42; *United States v. Washington,* 384 F.Supp. 312, 340–42 (W.D.Wash.1974).

These clearly established legal standards should be applied to issues of state regulation, but the application of these standards to particular regulations and any allocation issues are reserved for Phase II.

### XI.

■ The State requests that a decision in favor of the Band be certified for interlocutory appeal under 28 U.S.C. § 1292(b). It also requests that the May 13, 1994 Memorandum Opinion and Order ruling on summary judgment motions be certified. It argues that there is serious doubt about the merits in Phase I, and Phase II would be unnecessary if the Band's rights do not continue to exist. It asserts that Phase II will require substantial resources of the parties and the court. It contends that there is substantial ground for difference of opinion on the issues presented, the arguments of the parties are not frivolous, and no ruling could be so plainly correct that there would be no legitimate difference of opinion. It maintains that avoiding an unnecessary trial on Phase II issues would significantly advance the termination of the litigation.

The Landowners and the Counties support the State's request. The Counties argue that Phase I will resolve the "true merits of this case." It asserts that there is a strong likelihood that the Court of Appeals would reverse a decision in the Band's favor and that Phase II should not be held until this issue is finally resolved. The Landowners add that an appeal involving both Phase I and II would be unmanageable for the Court of Appeals. They also note there is no likelihood of settlement of Phase II issues if Phase I cannot be immediately appealed. They argue that an appeal of Phase I is appropriate if declaratory relief is entered because a declaratory judgment has the "force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

The United States also favors certification. It believes that its position on the merits is well grounded in the law and the record, but recognizes that the legal issues raised have significance. Final resolution of Phase I could conserve judicial resources, facilitate settlement of Phase II issues, and permit other Chippewa bands to present their claims in this case.

The Band opposes certification. It argues that there is no controlling issue of law on which there is substantial ground for difference of opinion. It asserts that the legal standards involved in this case are well established doctrines, including canons of construction of Indian treaties, the scope of Presidential authority, and abrogation of Indian treaties. It contends that the case turns on factual questions of intent, not disputed legal standards.

The Band also argues that appellate review of Phase I will not materially advance

the ultimate outcome of the litigation. It contends that Phase II issues could be ready for a single trial no later than 18 months from this decision. It asserts that an interlocutory appeal will prolong the litigation because it could take 18 months, and Phase II would still have to be tried and appealed. It notes that an interlocutory appeal would impose additional expenses on all of the parties, and that unnecessary delay will cause irreparable harm to the Band.

The Court of Appeals may choose to hear an appeal from an order that is not otherwise appealable if the district court certifies that it "involves a controlling question of law as to which there is substantial ground for difference of opinion" and that an "immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

The legal issues raised in Phase I do not present legal questions that are particularly novel or complex. The canons of construction for interpretation of Indian treaties are well established and require a careful examination of the historical record to determine the intent of the parties. This examination presents complex factual questions, but a complex record is not a basis for certification of a decision for appeal. The other legal question raised by the action relates to the scope of Presidential authority; the applicable law is also well established. The weight of precedent supports the court's rulings, particularly the Seventh Circuit's decision in *Lac Courte Oreilles v. Voigt*, 700 F.2d 341 (1983), which involved the same or similar issues. The case does not involve a controlling question of law as to which there is substantial ground for difference of opinion.

 Furthermore, there is no reason to believe that an immediate appeal would materially advance the ultimate termination of the litigation. Piecemeal appeals are not favored because they often result in additional costs for the judiciary and the parties. *Control Data Corp. v. International Busi-*

*ness Machines Corp.*, 421 F.2d 323, 325 (8th Cir.1970). Resolution of this case at the appellate level would be aided by a complete record so that the appeals court could see the whole parameters of the issues in full context. There is also little indication that the case would be settled short of final resolution, given the history of earlier settlement efforts when fewer parties were involved prior to the intervention of the Counties, Landowners, and the United States. Although the plaintiffs and the State agreed upon a settlement, the Legislature did not approve it after a spirited public campaign against it. Those who now seek certification might also seek hearing by the Supreme Court if unsuccessful after any interlocutory appeal. Certification would present serious prospect of long delay. For all these reasons the request for certification should be denied.[26]

## XII.

In reaching these findings and conclusions the court has had the benefit of a lengthy record and live testimony, as well as a line of relevant precedent. It is also not without significance that in this case there is representation from both sides to the treaties of 1837 and 1855 who jointly advocate the same interpretation of the treaties and of the 1850 executive order.

The court's decision today reaches only to the determination of plaintiffs' continuing rights under the 1837 treaty. Still to be determined are the full parameters of those rights, that is, to what extent the plaintiffs may permissibly be restricted by defendants in the exercise of those rights. Impermissible restriction by defendants would violate plaintiffs' treaty rights and rights under 42 U.S.C. § 1983.

Because it was not known earlier whether a second phase of this litigation would be required, discovery, motion, and trial readiness deadlines have not been set for the issues yet to be resolved. The case should therefore now be referred to Magistrate

26. The Counties and Landowners request that Band members be enjoined from exercising the privilege guaranteed by the 1837 Treaty until all Phase I issues have been resolved by appellate courts. This position has not been fully developed by its proponents as to the merits or as to its procedural basis. It may be related to the request for certification or it may be related to a future motion for a stay.

Judge Jonathan G. Lebedoff for scheduling purposes.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. it is hereby declared and adjudged that the privilege guaranteed to the Chippewa of hunting, fishing and gathering the wild rice upon the lands, the rivers and the lakes included in the territory ceded to the United States by the treaty of 1837 continues to exist.

2. the Counties' motion to strike Section V of plaintiffs' post-trial brief and any related proposed findings of fact and conclusions of law is denied;

3. the request for certification to the Court of Appeals under 28 U.S.C. § 1292(b) is denied.

4. the case is referred to Magistrate Judge Jonathan G. Lebedoff for setting discovery, motion, and trial readiness deadlines for Phase II.